**In the Matter of TRANS-HIGH CORPORATION, Debtor.**

**Bankruptcy No. 80 B 10089.**

United States Bankruptcy Court, S. D. New York.

Decision of Issues Raised on Trial of Involuntary Petition Feb. 28, 1980.

Opinion of Dismissal of Involuntary Petition March 19, 1980.

Baer, Marks & Upham, New York City, for petitioning creditor Paper Sales Corporation.

Hyman & Miner, New York City, for debtor.

## DECISION OF ISSUES RAISED ON TRIAL OF INVOLUNTARY PETITION

EDWARD J. RYAN, Bankruptcy Judge.

On January 22, 1980, Paper Sales Corporation (PSC) filed an involuntary petition seeking relief against Trans-High Corporation (THC) under Chapter 11 of the Bankruptcy Code. PSC alleged that THC had less than twelve creditors and was not generally paying its debts as such debts became due.

After preliminary skirmishing, the matter was set down for trial of the issue whether the debtor, at the time of the filing of the petition, was generally not paying its debts as such debts became due. In the interim, sufficient creditors in number joined in the involuntary petition. THC, the debtor, disputed that merely by moving for leave to intervene, the creditors had joined in the petition. Further, THC contended that the filing by PSC was "in bad faith". Accordingly, the debtor argued, other creditors may not intervene. These contentions were overruled.

At the trial of the issue on February 13, 1980, PSC called two witnesses, both of

whom were employees of the petitioning creditor PSC. Two exhibits were received in evidence. Exhibit 1 is a November 1979 Dun & Bradstreet Report. Exhibit 2 is the Accounts Payable Schedule filed by THC with its answer. When the petitioning creditor PSC rested, the debtor moved to dismiss. Decision on this motion was reserved; whereupon THC rested.

This brief decision is filed at this time so that any appeals may be heard at an early time. An opinion is being prepared and will be filed when complete.

The evidence received at the trial disclosed that PSC's normal payment terms for THC were ninety days. This period is considerably longer than the terms set forth in the writings between the parties.

THC has more than 225 creditors as shown on the schedules annexed to the answer. The credit terms that these other creditors extended were unknown to the witnesses called by the petitioning creditor. No evidence was offered as to when the debts reflected on the schedule of Accounts Payable *became payable*, as opposed to merely *becoming due*. See, *inter alia*, Black's Law Dictionary, Fifth Edition, 1979, page 448, "Due."

No creditor-witness (other than itself) was called by PSC in support of its claim that THC was not paying its debts as they matured, despite the fact that the petitioning creditor knew the names and addresses of the creditors and had, in fact, been in touch with several of them prior to the trial. PSC's vice president testified that it was his opinion that the debtor was not paying its debts as such debts became due because of his assumption that the list of Accounts Payable, Exhibit 2, was an aging schedule rather than a chronological list of debts. In other words, the witness did not know whether the listing of creditors on Exhibit 2 had anything to do with the time when the obligation to pay arose.

The credit manager of the debtor likewise assumed that Exhibit 2 was an aging statement of accounts payable. He, too, inferred that debts were overdue even though he did not know the terms of payment.

Exhibit 1, the Dun & Bradstreet Report of THC which had been ordered by PSC, shows, *inter alia,* that as of November 1979, there were no known overdue accounts of the debtor. The exhibit also shows that the assets of THC were $1,471,055; its liabilities were $985,096, and its net worth was $585,959 [$485,959(?)]. PSC's vice president's testimony shows that he concluded that the debtor was generally not paying its debts as they became due on the basis of the information disclosed by Exhibit 1 when it was received by him. He instructed that the involuntary petition be filed based upon this limited information.

■ Exhibit "2" is entitled "Schedule of Accounts Payable" and contains the following column headings: January 1980 payments; Bal. 12/31/79; Current December 1979; 30 days November 1979; 60 days October 1979; 90 days September 1979; and Prior.

The Schedule contains the following relevant information:

A. THC had in excess of 200 creditors.

B. As of December 31, 1979, THC had an indebtedness to its trade creditors, excluding PSC and Quad/Graphics of $367,371.26.

C. In January 1980 THC paid its trade creditors, excluding PSC and Quad/Graphics, the sum of $218,325.63.

D. The debts due THC's creditors were divided under the column headings in that the total amount due was shown in column entitled "Bal. 12/31/79" and a breakdown on that total appeared under the other column headings.

E. Credits due THC from its trade creditors were also listed on the accounts payable by brackets: *DMS Travel, Inc.* was owed $492 (Col. "Bal. 12/31/79") of which $204 was listed under Col. "Current December 1979"; [$168] was listed under Col. "30 days November 1979" and $456 under the column "60 days October 1979"; and *Standard Rate and Data Service* was owed $979.90 (Col. "Bal. 12/31/79") with $640.90 in the column "60 days October 1979", [$84] in the column

"90 days September 1979" and $423 in the column "Prior".

Exhibit "2" does not list when payment is actually payable to any creditor or when the debt listed matured; therefore, Exhibit "2" does not establish that THC is not meeting its debts as they mature. The assumption by PSC that Exhibit "2" is, in fact, an aging of accounts payable is inconsistent with the schedule which, on its face, shows credits appearing in the 30, 90 and prior columns.

The petitioning creditor has failed to carry its burden of proof that Exhibit 2 accurately shows that *payment* of those obligations is overdue. It is, at least, equally inferable that the schedule reflects those periods of time within which the obligations arose. There is no evidence with respect to when payment was actually due from the debtor.

11 U.S.C. § 303(h) provides, in pertinent part:

"[A]fter trial, the court shall order relief against the debtor in an involuntary case . . . only if—

(1) the debtor is generally not paying such debtor's debts as such debts become due; . . ."

■ In my opinion, the common sense interpretation of this portion of the statute means that an order for relief is proper where the debtor is not paying its debts *in the regular course of its business*. To find that a debtor is not paying its debts in the regular course of its business requires evidence of what that regular course of business actually is. The record before me is nearly barren with respect to when the debtor's creditors actually expected to be paid, regardless of when the obligation arose. The exception is the evidence that PSC gave the debtor generous terms of payment.

The involuntary petition must be, and it is dismissed.

It is so ordered.

## OPINION ON DISMISSAL OF INVOLUNTARY PETITION

On February 28, 1980, the court filed its decision and order dismissing the involuntary petition which initiated these proceedings seeking an order for relief under 11 U.S.C. § 303(h). The decision was filed at that time so that an appeal by either party might be heard at the earliest possible time. The economic impact upon an alleged bankrupt is self-evident. As stated in *Bankruptcy Law and Practice*, Cowans, Vol. 2, § 805, pp. 571, 572:

"The period from the time of the filing of the creditor's involuntary petition until there is either an adjudication of the debtor as a bankrupt or until the case is dismissed is or can be a very trying time. The debtor is not technically a bankrupt and is still the owner of the assets he owned before the petition. However upon adjudication, the title to assets passes to the trustee as of the original date of the petition. Thus the position of the debtor is a very tenuous one. The chances of his obtaining credit are poor if the persons with whom he deals are aware of the pendency of the petition. Failure to advise them may be considered fraud. There is a real risk of considerable damage to the business of the debtor on a going concern value basis from the pendency of the petition. It is conceivable that if the debtor was not insolvent at the time of the petition, he may well become so as a result of it. * * *"

Cowans wrote about a Bankruptcy Act case; a Code debtor is in little different economic position.

This opinion is now filed to amplify the decision to the extent that the court overruled the debtor's contention that creditors were precluded from intervention.

■ The debtor had sought dismissal on February 6, 1980, alleging, *inter alia*, that since, in fact, more than eleven creditors held claims against the debtor, at least three such creditors were required to file an involuntary petition. 11 U.S.C. § 303(b). Accordingly, the debtor urged that the case must be dismissed because, despite the sub-

**4**

sequent intervention by other creditors, the "bad faith" of the petitioning creditor prohibited any intervention. The debtor relied on *Navison Shoe Co. v. Lane Shoe Co.*, 36 F.2d 454 (1st Cir. 1929); *In re Crofoot, Neilson & Co.*, 313 F.2d 170 (7th Cir. 1963); and *In re Crown Sportswear*, 575 F.2d 919 (1st Cir. 1978) as authority for this proposition.

The debtor's reliance on *Navison* and its progeny is misplaced. A close reading of those cases shows that in each case it was indisputable that an act of bankruptcy had been committed, to wit, the fourth act of bankruptcy: —the alleged bankrupt had made a general assignment for the benefit of its creditors. In each case, the four-month period had expired so that a petition might not be filed *de novo* based upon the commission of the act of bankruptcy.

The language of the cases relied upon by the debtors shows that the courts imposed the sanction of dismissal of the petition as a sort of punitive measure.

"A person who suspects his statement is false does not entertain an honest belief it is true, or is consciously and wickedly indifferent to its truth or falsity." *Navison, supra*, at 459.

"If there was no fraud in filing of the petition, 11 U.S.C.A. § 95, sub. d, required notice to other creditors. . . . If there was fraud[4] notice was not required. This is a vital point on which a clear cut finding and conclusion must be made." *Crofoot, supra*, at 172. Footnote 4 is as follows: "The implication of fraud could have grave consequences for the attorney under Rule 11, Federal Rules of Civil Procedure."

"Intervention is a matter of right unless the bankruptcy court finds the petition was made in bad faith for the purpose of improperly invoking its jurisdiction." *Crown, supra*, at 993.

These authorities are clearly distinguishable from the case at bar, since in those cases there was no timely intervention by other creditors. This was noted in *Sun-Lite Awning Corp. v. E. J. Conklin Aviation Corp.*, 176 F.2d 344, 347 (4th Cir. 1949).

It is one thing to punish a person guilty of fault by depriving him of his option for bankruptcy liquidation instead of state court insolvency proceedings.[1] It is another story when a debtor seeks to preclude from the bankruptcy option other creditors who are innocent of the fault.

---

1. The distinction is discussed in Cowans, *supra*, § 73, and in *Collier on Bankruptcy*, 14th ed., ¶ 62.32[1].