**In re TOWN OF WESTLAKE, TEXAS, Debtor.**

**Bankruptcy No. 397–35297 RCM–9.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

July 25, 1997.

---

J. Robert Forshey, Fort Worth, TX, Patrick J. Neligan, Jr., Dallas, TX, Joseph Colvin, Fort Worth, TX, for debtor.

J. Michael Sutherland, Dallas, TX, E. Allen Taylor, Jr., Fort Worth, TX, for Southlake.

David Parham, Dallas, TX, for Maguire.

William B. Finkelstein, Dallas, TX, for Hillwood.

Stephen A. McCartin, Dallas, TX, for Committee of Landowners.

## MEMORANDUM OPINION

ROBERT C. McGUIRE, Bankruptcy Judge.

This opinion involves a ruling on a motion to dismiss a Chapter 9 bankruptcy filed by the Town of Westlake, Texas ("Westlake") or ("Debtor"). This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A) and (O). Following are the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rules 9014 and 7052 with respect to the hearing that occurred July 11, 1997, with final arguments July 16, 1997. Westlake admits that it has the burden of proof on its good faith under § 921(c), and to qualify as a debtor under 11 U.S.C. § 109(c). The City of Southlake, Texas ("Southlake"), Maguire/Thomas Partners–Westlake/Southlake Partnership ("the Partnership"), Hillwood Development Corporation, Hillwood/Willow Bend Ltd., Hillwood/822, Ltd., Hillwood/1088, Ltd., Lakeway Land, Ltd., and Lakewood Property Company, Ltd. (collectively "Hillwood"), and Carroll Huntress, Howard Dudley, Al Olien, Jerry Moore, and Dale L. White (the "Individuals") all filed motions to dismiss this Chapter 9. All of such parties collectively are hereafter referred to as "Movants."

### Factual Background

Westlake is a small Type A municipality located in northern Tarrant County having approximately 250 citizens.

On May 2 and May 8, 1997, Westlake's board of aldermen purported to disannex allegedly approximately 90% of the town's area. Westlake contends such action was wrongful.

The disannexations on May 8, 1997, included the Solana business park, a high profile corporate campus. Solana provides approximately 99% of Westlake's present tax income. Aside from having no further obligation for police and fire protection to the disannexed area, there was no showing that Westlake received any consideration for the disannexation of Solana.

Westlake's money was deposited in the TexPool through the State of Texas and with the Keller State Bank. Because of a political dispute over who had authority to sign Westlake checks, as of June 1, 1997, the TexPool funds were frozen. The funds on deposit

with Keller State Bank were likewise frozen, and on June 4, 1997, the bank filed an interpleader action in the state courts of Tarrant County.

On June 9, 1997, the date this case was filed, all Westlake's funds were frozen.

After the disannexations, Westlake is a fraction of its former size. Westlake contends that it has insufficient revenue to continue to operate as a viable municipality and to continue to provide basic municipal services to its citizens; this includes the maintenance of public safety and welfare on Westlake's roadways.

In a pending state court suit, Westlake seeks to avoid the disannexation of Solana, which constitutes almost all of its tax base, as a fraudulent transfer under § 548 and/or § 544(b) of the Bankruptcy Code. Because Westlake contends it has no corollary avoidance rights under Texas law, its sole avoidance remedy is allegedly under the Bankruptcy Code in state court, following this Court's abstention from hearing the previously-filed like adversary proceeding. Westlake contends that, without this bankruptcy being left pending, this alleged cause of action will be extinguished. For purposes of this decision, it is unnecessary for this Court to reach the issue of whether such a disannexation, even if wrongful, would constitute a fraudulent conveyance under 11 U.S.C. § 548 and/or § 544(b).

The defendants in the avoidance action seek dismissal of the case.

### *Movants*

*Hillwood*—These entities own the Circle T Ranch. Their land has purportedly been disannexed

*Southlake*—Southlake is attempting to annex Solana.

*The Partnership*—This group owns Solana and allegedly it will be to their tax benefit if the disannexation stands. The Partnership and Westlake are parties to a lease on the Town Hall for a few hundred dollars a month. Westlake is current on the lease.

*The Individuals*—The individual aldermen are not creditors, and are allegedly no longer residents of Westlake. They are the alleged perpetrators of the questioned disannexation.

### *Standing*

■ In pending state court litigation, Hillwood, as a counter-claimant, has claims against Westlake for costs and attorney fees under the Texas Declaratory Judgment Act, § 37.009 Texas Civil Practice and Remedies Code. Hillwood is a party in interest under 11 U.S.C. § 1109. *See* § 901(a) (making § 1109 applicable in Chapter 9); *see also* § 901(b) (stating that a term used in another section and made applicable by § 901(a) generally has the same meaning in a Chapter 9 case); *see* 11 U.S.C. § 101(10)(A) (defining "creditor" as an "entity that has a claim against the debtor" arising at or before the petition date); § 101(5)(A) (defining "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, ... disputed, undisputed....").

■ By virtue of the interlocal sewer line agreement between Southlake and Westlake, Southlake is a contingent creditor of Westlake and a party in interest under § 1109. Southlake has a sufficient stake in the outcome to be a party in interest. *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3rd Cir.1985); *Unofficial Committee of Zero Coupon Noteholders v. Grand Union Co.*, 179 B.R. 56, 58 (D.Del.1995).

Since Hillwood and Southlake have standing and since they assert basically the same contentions as all the other Movants, it is unnecessary to address the standing issue in relationship to the remaining Movants.

### *11 U.S.C. § 921(c)*

Under 11 U.S.C. 921(c), a Chapter 9 petition can be dismissed if the debtor did not file the petition in good faith or if the petition does not meet the requirements of the title.

11 U.S.C. § 109(c) reads as follows:

(c) An entity may be a debtor under chapter 9 of this title if and only if such entity—

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

Westlake meets the requirements of 11 U.S.C. § 109(c)(1) & (2). However, it is not insolvent within the meaning of 11 U.S.C. § 109(c)(3).

(32) "insolvent" means—

* * * * * *

(C) with reference to a municipality, financial condition such that the municipality is—

(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or

(ii) unable to pay its debts as they become due.

11 U.S.C. § 101(32)(C).

### *Insolvency Under 11 U.S.C. § 101(32)(C)(i)*

▆ Westlake was generally paying its debts when they became due within the meaning of § 101(32)(C)(i). The reference date under § 101(32)(C)(i) is the date of the petition. *In re Sullivan County Regional Refuse Disposal Dist.,* 165 B.R. 60, 75 (Bankr.D.N.H.1994) *("Sullivan County"); In re City of Bridgeport,* 129 B.R. 332, 336–337, 339 (Bankr.D.Conn.1991) *("Bridgeport").* Westlake was substantially current to creditors on petition date. Westlake's funds had been temporarily frozen pending resolution of a political dispute over who had authority to sign Westlake checks. Keller Bank was temporarily refusing to honor checks until the authority issue was resolved. Keller Bank filed an interpleader to resolve this issue. TexPool temporarily froze funds for the same reason. Westlake was a party to multiple litigation in various state courts over disannexation issues. There was a political dispute over who was the mayor of Westlake. In the case of *In re Petro Fill Inc.,* 144 B.R. 26, 30 (Bankr.W.D.Pa.1992), it is stated:

The relevant standard for determining whether or not an alleged debtor generally is paying its debts is not a mechanical one. *See In re All Media Properties Inc.,* 5 B.R. 126, 143 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir.1981). Rather, it is flexible and involves consideration of the totality of the circumstances and requires a balancing of the interests of the alleged debtor against the interests of its creditors. *See Bartmann v. Maverick Tube Corp.,* 853 F.2d 1540, 1546 (10th Cir.1988).

*See also In re Norris,* 183 B.R. 437, 455 (Bankr.W.D.La.1995).

Per Movants' Exhibit ("MX") 18, as of petition date, Westlake had total non-contingent obligations in the range of $122,199. (There was some indication that the Principal Financial Securities' bill of $11,497, which

was part of such sum, may have been disputed). Of this $122,199 in Westlake obligations, as of the June 9, 1997 petition date, only approximately $29,000 of such claims had very recently ripened by the creditors having sent bills. Except for such $29,000, Debtor was current on all its obligations.

It appears that a temporary political dispute over authority to sign checks from admittedly ample funds does not make an alleged municipal debtor qualify as being insolvent by reason of "generally not paying its debts as they become due." § 101(32)(C)(i). *See In re Petro Fill, Inc.,* 144 B.R. 26.

Even under Westlake's figures, in Westlake's Exhibit ("WX") 43A, it had cash at the beginning of June 1997 of approximately $1,895,321, and at the end of June 1997, "cash available for expenditures" of $1,778,-035.51, and the normal fund balance reserve. This substantially ties in with Westlake's May 31, 1997 balance sheet (MX 5), which balance sheet needed to be adjusted for current liabilities (MX 18). Reference is made to the testimony of Ms. Crosswhite, the town secretary in this regard.

### Insolvency Under § 101(32)(C)(ii)

 Westlake alternatively contends that it is insolvent under § 101(32)(C)(ii) because it is unable to pay its debts as they become due. There was insufficient credible proof of such insolvency. This is a prospective test of inability to pay, not a retrospective test. *Caruso Enterprises, Inc. v. U.S.A Motel Corp. (In re U.S.A. Motel Corp.),* 450 F.2d 499, 503 (9th Cir.1971); *First Nat. Bank of Cincinnati v. Flershem* 290 U.S. 504, 517, 54 S.Ct. 298, 303, 78 L.Ed. 465 (1934) *("Flershem")* (equity receivership). As stated in *In re Hudson & Manhattan R.R.Co.,* 138 F.Supp. 195, 200 (S.D.N.Y.1955) *("Hudson & Manhattan"),*

It has been previously held that inability to meet debts as they mature is not limited to debts which have already matured. *In re Kelly Springfield Tire Co.,* D.C. Md., 10 F.Supp. 414 [(1935)]; *Matter of American–*

*LaFrance & Foamite Corp.,* D.C.S.D.N.Y., Civ. 609–43 (Report of Special Master Harold R. Medina). *If the maturity of the debt is imminent and the inability to meet it certain, the debtor is unable to meet debts as they mature within the meaning of the statute. The question is whether two and one-half years is too far into the future to look. No authority suggests a fixed limit in this regard. It would seem to depend upon the inescapable quality of the obligation and the certainty that it cannot be met. Mere possibility or even speculative probability is not enough. First National Bank of Cincinnati v. Flershem,* 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465 [(1934)].

Here certainty seems established as convincingly as it can be in human affairs. The amount of the obligation to be met was huge, $46,339,404.62. It could not be avoided. No fund existed for its redemption. Efforts to refinance through negotiation with present bondholders had been abandoned as fruitless. Interest rates on any new borrowing would have been prohibitive, assuming that anyone would have loaned the debtor the full amount of its bonds. Other plans, such as the sale of the debtor's most profitable asset, its terminal building, and also the sale of its uptown Manhattan branch, had all been abandoned as impracticable. The debtor's prospects were not improving but on the contrary were getting worse. It had consistently failed to earn its expenses and interests for several years.

Under theses circumstances, to insist on further liquidation to a point of actual default would be to ignore the purpose of Chapter X, which contemplates court intervention while there is still some hope of survival through readjustment of fixed obligations.

(emphasis supplied). (footnote omitted). Decisions construing the language of the Act are useful guides for the interpretation of comparable language in the Code. *Bridgeport,* 129 B.R. at 336 n. 7.

In *Flershem,* 290 U.S. at 516–17, 54 S.Ct. at 303, the court discussed the impropriety of

deliberately defaulting when "[i]nsolvency was not present, or imminent. The debentures were not to mature until 1947 [although the case was filed in 1931]. Insolvency even in the remote future was not certain." *Id.* at 517, 54 S.Ct. at 303. The company deliberately defaulted when there were ample funds on hand. *Id.* at 516–517, 54 S.Ct. at 303.

■ The beginning point of the insolvency analysis is the petition date. *Bridgeport,* 129 B.R. at 337; *Sullivan County,* 165 B.R. at 75. *Bridgeport* goes on to conclude that, under 101(32)(C)(ii), to be found insolvent, a city must prove that it will be unable to pay its debts as they become due in its current fiscal year or based upon an adopted budget in its next fiscal year. *Bridgeport* 129 B.R. at 338.

■ On July 10, 1997, the day before the July 11, 1997 hearing on the motion to dismiss, without following Texas' required statutory formalities for an adopted budget, Westlake purported to adopt a budget for the fiscal year 1998. (WX 47). Basically, such budget substantially adopted Mr. Hanley's figures in WX 43A. However, even if the window under § 101(32)(C)(ii) is longer than next year's budget (*Bridgeport,* 129 B.R. at 338), and could be expanded to two and one-half years,[1] there must be an "inescapable quality of the obligation and the certainty that it cannot be met. Mere possibility or even speculative probability is not enough." *Hudson & Manhattan,* 138 F.Supp. at 200.

As previously indicated under Westlake's figures, it had, as of June 30, 1997, "cash available for expenditures" of $1,778,035. (WX 43A).

Both Movants' expert Terry Kyle and Westlake's expert Bill Hanley testified that they had never seen a municipality purposefully adopt a budget with a projected deficit. However, Mr. Hanley's budget for Westlake for fiscal year 1998 (WX 43A) shows a budget deficit beginning in March 1998 and continuing monthly thereafter so as to produce ending cash deficit on September 30, 1998 of $902,438, and a minus $961,601 cash available for expenditures. Such budget shows the following cash outlays: For September 1997, $195,370 for water and wastewater, notwithstanding the fact that Westlake does not presently provide water and sewerage to its residents and any such contingent indebtedness of $195,370 would only be incurred if it hooked up with Southlake.

Westlake's Exhibit 43A budgets road repair expense of $117,408 per month, or $1,408,896 for road repairs for fiscal year 1998. This figure is not credible. Westlake initially budgeted $115,000 for road repair in 1997 (MX 2), but only spent $18,641 (MX 7). Per Movants' Exhibit 8, for the fiscal year ending September 30, 1995, Westlake's total expenditures apparently did not exceed $201,531 and no road repair expenses were shown. This finding is not meant to cast aspersions on Ron Young, Westlake's engineer witness. Mr. Young was not contacted until June 30, 1997, to provide testimony for the July 11, 1997 dismissal hearing. It appears that his testimony was sought by Westlake to attempt to have Westlake fall within the parameters of *Bridgeport,* 129 B.R. at 336–338. The credible evidence was that a Texas municipality does not generally undertake massive road capital improvements, like these projections, until ample funds are available or obtainable.

The legitimacy of Westlake's figures for road repairs has to be evaluated in light of present practices of other like Texas municipalities, Westlake's own historical road expenses, and the context of the circumstances of how such $1,408,896 figure was arrived at.

For fiscal year 1998, beginning October 1, 1997, and ending September 30, 1998, Westlake also projected legal fees and expenses of $121,860 and professional fees of $375,000. (WX 43A). For the month of June 1997, legal fees were projected at $10,155 and professional fees at $28,845. (WX 43A). For July through September 1997, legal fees were projected at $30,465 and professional fees were projected at $493,845. By con-

---

1. *See Hudson & Manhattan,* 138 F.Supp. at 200.

trast, for the fiscal year ended September 30, 1996, Westlake's actual expenses (MX 7) for 1996 included the following:

Capital outlay—waterline infra-
structure oversizing | $12,066
Street equipment and repair | $18,641
Accounting and consulting | $ 7,266
Engineering | $23,583
Planning road improvements | $ 5,000
Contract services—police and
fire | $26,695
Legal | $42,937
Planners fees | $79,480

Westlake's total expenditures in fiscal year 1996 were $317,607 (MX 7), and for 1995 they were $201,531 (MX 8).

Westlake does not have an ad valorem tax, but even if it added an ad valorem tax, the first payments on same would not be due until December 1998. On Westlake's remaining property, the maximum ad valorem taxes that could be charged would generate no more than in the range of $120,000 to $125,000 per year. The maximum permissible tax rate is a rate of $1.50 per $100 taxable value. This would be an extremely high rate. For example, Fort Worth has a rate in the range of $.98 per $100 valuation, and Fort Worth's rate is on the high side. The tax rate of comparable cities is in the range of $.35–$.60 per $100 valuation. Thus, it appears that when and if Westlake enacts an ad valorem tax, the maximum realized tax revenues from same would be in the range of $40,000 to $80,000, if the disannexation is not set aside.

It is recognized that Westlake is embroiled in litigation; however, § 101(32)(C)(ii) does not appear to encompass a situation where a municipality deliberately budgets or spends itself into insolvency [2] (so as to qualify under § 101(32)(C)(ii)), when other realistic avenues and scenarios are possible, such as: refiguring road expenses in light of the discussion above, negotiating with attorneys about fee contracts, approaching developers, seeking business relocations, conserving and maximizing remaining ample funds, etc.

Westlake is not insolvent within the meaning of § 101(32)(C)(ii). There was insufficient credible proof that Westlake is unable to pay its debts as they become due.

### 11 U.S.C. § 109(c)(4) Desire to

### Effectuate a Plan to Adjust "Such Debts"

■ With the possible exception of the Principal Financial Securities claim of $11,497 on MX 18, all the claims on MX 18 have been paid in full. The freeze on Westlake's funds was released by agreed order negotiated at the first hearing scheduled in this case on June 12, 1997.

■ It appears that normally desire to adjust under § 109(c)(4) should be tested as of petition date. Westlake intended to pay the debts on MX 18 in full as soon as authority to sign on the Westlake account was cleared up. Therefore, it appears *such* debts were not going to be adjusted in the sense of any modification or impairment.

If tested as of petition date, the purported 1998 future road expense of $1,408,896, aside from the credibility problem, would not be involved as an adjustment of an existing debt because, as of petition date, it was unknown. It would not comprise one of "such debts." Likewise, there was no indication from Westlake that it filed its petition with a desire to adjust its own attorney fees.

Westlake did not satisfy § 109(c)(4).

### § 109(c)(5)

■ If the Court is incorrect on § 101(32)(C)(i), where the Court found that such frozen funds did not make an otherwise solvent debtor insolvent under § 101(32)(C)(i), then § 109(c)(5) might be relevant in such context. However, § 109(c)(5) talks in terms of negotiating with creditors a municipal debtor intends to impair. Westlake intended to pay in full the creditors on

---

**2.** Such a process appears to be akin to the *Flershem* court's disapproval of an alleged debtor deliberately defaulting when insolvency was not present. *Flershem*, 290 U.S. at 516–517, 54 S.Ct. at 303.

MX 18; therefore, no impairment was intended. Debtor did not negotiate with the creditors on MX 18, or otherwise, except with respect to one creditor on MX 18 who called, concerned about media reports. Debtor had no problem assuaging such creditor by advising such creditor that it would be paid in full as soon as authority on the bank account was established.

Debtor's trying to deal with the 1998 budget and trying to fit within the parameters of § 109(c)(4) & (5) show how Westlake just does not fit the mold of a typical, legitimate Chapter 9 debtor.

### § 921(c) Good Faith

■■■ While it is a close question, it appears this case was filed in good faith. At filing, Westlake faced the shadow of frozen funds, multiple litigation, and disannexation of a substantial portion of its tax base. It appears such filing was warranted by good faith argument for extension of existing law and not done for an improper purpose. *In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514 (Bankr. S.D.N.Y.1996); *In re 9281 Shore Road Owners Corp.*, 187 B.R. 837 (E.D.N.Y.1995).[3]

Judgment will be entered in accordance with the foregoing opinion.

### ORDER DISMISSING CHAPTER 9 PETITION

On July 11 and 16, 1997, the Objections to the Town of Westlake's ("Westlake") Chapter 9 Petition or Motions to Dismiss (the "Motions"), filed by the City of Southlake, Texas, Carroll Huntress, Howard Dudley, Al Olien, Jerry Moore, Dale L. White, Maguire/Thomas Partners—Westlake/Southlake Partnership, Hillwood Development Corporation, Hillwood/Willowbend, Ltd., Hillwood/822, Ltd., Hillwood/1088, Ltd., Lakewood Land, Ltd., and Lakewood Property Company, Ltd.

were considered by the Court. The relief sought in the Motions constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A) and (O). After considering the Motions, Westlake's Chapter 9 Petition, Westlake's response to the Motions, the evidence, the arguments of counsel, and for the reasons, findings of fact and conclusions stated in the opinion, the Court is of the opinion that the Motions should be granted and that pursuant to 11 U.S.C. § 921(c), the Court should decline to enter an order for relief, dismiss the Chapter 9 Petition and dismiss this case. Therefore, it is

ORDERED that this case is hereby dismissed; and is further,

ORDERED that pursuant to Bankruptcy Rules 7054(b) and 9014, costs are hereby taxed against Westlake.

■■■■■■■■■■■■■■■■

---

**3.** To paraphrase Daniel Webster's argument to the Supreme Court in 1818 about Dartmouth College, in the *Dartmouth College* case, *Trustees of Dartmouth College v. Woodward*, 4 Wheat. 518, 17 U.S. 518, 4 L.Ed. 629 (1819), "It is a small [town], and yet there are those who love it." *Matter of Abrams*, 206 N.Y.L.J. 27, at col. 5 (1991).