**UNITED STATES COURT OF APPEALS**
**Tenth Circuit**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80294**
**(303) 844-3157**

Patrick J.  Fisher, Jr.                                                          Elisabeth A. Shumaker
Clerk                                                                            Chief Deputy Clerk

May 28, 1998


**TO:**  ALL RECIPIENTS OF THE CAPTIONED OPINION

**RE:**  97-1099, *Hamilton Creek v. Bondholders Colorado Bondshares*
Filed May 15, 1998


The published opinion contains a clerical error.  On page one of the slip opinion, counsel for the appellee should appear as follows:

Caroline C. Fuller, Fairfield & Woods, Denver, Colorado, for Appellee.

Please make the appropriate correction to your copy of the opinion.

Sincerely,

Patrick Fisher, Clerk


By:
Keith Nelson
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 15 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

In re:  HAMILTON CREEK
METROPOLITAN DISTRICT, a
Summit County municipality,

    Debtor,

HAMILTON CREEK
METROPOLITAN DISTRICT,

    Appellant,

v.

BONDHOLDERS COLORADO
BONDSHARES,

    Appellee.

No. 97-1099

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### (D.C. No. 96-Z-2299)

Jeffrey Cohen, Sullivan & Worcester, New York, New York, for Debtor-Appellant.

Caroline C. Fuller, Fairfield & Woods, Denver, Colorado, for Appellee.

Before **KELLY** and **HENRY**, Circuit Judges, and **BRETT**,[*] District Judge.

_____

**KELLY**, Circuit Judge.

_____

Debtor-Appellant Hamilton Creek Metropolitan District appeals from the district court's affirmance of the bankruptcy court's dismissal of its petition for relief under chapter 9 of the Bankruptcy Code. Our jurisdiction arises under 28 U.S.C. § 158(d), and we affirm.

Background

Hamilton Creek Metropolitan District is a quasi-municipal corporation in Summit County, Colorado. In 1985, the District issued general obligation bonds in the amount of $2,125,000 to fund a new housing development project. After experiencing financial difficulties from 1987 to 1989, the District filed for chapter 9 relief. Through negotiations with its bondholders, the District agreed to a plan for debt adjustment ("Plan") which was confirmed by the bankruptcy court in 1990. See Aplt. Brief, exh. A (First Amended Plan for Adjustment of Debts).

The Plan provided for the issuance to the original bondholders of exchange bonds in the amount of $2,116,000, earning 11.25% interest to be paid from the District's tax levies and other revenues. With respect to the interest obligations,

_____

[*] The Honorable Thomas R. Brett, United States Senior District Judge, Northern District of Oklahoma, sitting by designation.

the exchange bonds bore significantly modified terms as compared to the original

bonds. Interest on the original bonds was due on semi-annual installments dates.

Under the Plan, however, actual payment of interest was only required on these

dates to the extent District funds were available after the payment of maintenance

and operations expenses, and the making of deposits to the District's capital fund.

See Plan ¶¶ 1.5, 4.2.5, 4.3.2, 5.3.2, & 5.7.1. In addition, the Plan capped the tax

levy required for the purpose of making these payments. See Plan ¶ 5.3.2.[1] Any

unpaid interest would remain an obligation of the District, and itself would accrue

additional interest. See Plan ¶¶ 4.2.4, 4.3.2, & 5.7.2.

Development did not progress as the District had anticipated when the Plan

was confirmed, and the District offered to repurchase all bonds at their par value

in exchange for the bondholders' forfeiture of all accrued interest. See Aplt.

Brief, exh. B (Notice of Conditional Bond Repurchase Offer). The bondholders'

principal, however, was not at risk because the Plan established a government-

---

[1] Paragraph 5.3.2 provides:

> For the purpose of paying the interest on and principal of the New Bonds as the same become due and payable, respectively, after payment for District operations, maintenance and deposits to the Capital Fund, the terms of the New Bonds shall require a maximum levy . . . according to the following schedule . . . .

Plan ¶ 5.3.2. This paragraph then contains a schedule requiring at most a mil levy ranging from 20 mils in 1989 to 40 mils in 2004 and "[t]hereafter." Id.

backed reserve fund to secure payment of the entire amount. See Plan ¶ 5.5. Ten percent of the bondholders, including Appellee Colorado Bondshares, rejected the offer, which was conditioned on unanimous acceptance. On July 5, 1996, the District again filed for chapter 9 relief, and Colorado Bondshares objected. The District had paid the interest on the bonds to the extent the relevant Plan-defined funds were available, and had paid all other debts as they had become due.

The bankruptcy court dismissed the District's petition, finding the District was not insolvent under federal or state law, and the district court affirmed. The District argues on appeal that the bankruptcy court erred because (1) the differing state definition of insolvency in Colorado's authorization statute is preempted by the federal definition; (2) even if the state definition is not preempted, the District was insolvent under the state definition; and (3) the District was insolvent under the federal definition. See 11 U.S.C. § 101(32)(C) (federal definition); Colo. Rev. Stat. § 32-1-1402(2) (1997) (state definition).

Discussion

We review the bankruptcy court's determinations of law de novo. See In re Pasek, 983 F.2d 1524, 1526 (10th Cir. 1993). We must, however, accept its factual findings unless they are clearly erroneous. See id. A finding of fact is not clearly erroneous unless it is without factual support in the record, or, although there is evidence to support it, we are left after a review of the entire record with

a definite and firm conviction that a mistake has been committed.  See Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985).

To be eligible for chapter 9 relief, a petitioner must meet several criteria, which are to be construed broadly to provide access to relief in furtherance of the Code's underlying policies.  See In re Sullivan County Reg'l Refuse Disposal Dist., 165 B.R. 60, 73 (Bankr. D.N.H. 1994).   Most pertinent here, "[a]n entity may be a debtor under chapter 9 . . . if and only if such entity . . . is insolvent . . . ."  11 U.S.C. § 109(c).  For a municipality, insolvency is defined as the financial condition in which the municipality is "(i) generally not paying its debts as they become due . . . ; or (ii)  unable to pay its debts as they become due."  11 U.S.C. § 101(32)(C).  While the test under § 101(32)(C)(i) looks to current, general nonpayment, the test under § 101(32)(C)(ii) is an equitable, prospective test looking to future inability to pay.  See In re City of Bridgeport, 129 B.R. 332, 336-337 (Bankr. D. Conn. 1991).  The tests of insolvency are applied as of the time of filing, see In re Town of Westlake, 211 B.R. 860, 866 (Bankr. N.D. Tex. 1997), and the petitioner bears the burden of proving one of them is met, see Tim Wargo & Sons, Inc. v. Equitable Life Assurance Soc'y (In re Tim Wargo & Sons), 869 F.2d 1128, 1130 (8th Cir. 1989).

The District argues on appeal that it was insolvent under § 101(32)(C)(i) because the semi-annual installment dates for its interest payments on the new

bonds have passed, while the District was not paying them in full. Additionally, the District argues that it was insolvent under § 101(32)(C)(ii) because it will be unable to make full interest payments on future semi-annual installment dates. In particular, the District contends that the Plan provisions requiring interest payment only to the extent certain Plan-defined funds are available do not prevent the payments from being "due" under the statute, but merely place a contingency on the bondholders' right to payment. We disagree, and conclude the bankruptcy court was not clearly erroneous in finding an absence of insolvency under the federal definition as required at the time of filing, rendering the District's remaining arguments moot.[2]

First, the District's interpretation is unsupported by the plain language of the statute. We presume the plain language of a statute expresses congressional intent. See Ardestani v. INS, 502 U.S. 129, 135-36 (1991). This expression lies

---

[2] In so disposing of this case, we are not assuming jurisdiction in contravention of Steel Co. v. Citizens for a Better Environment, 118 S. Ct. 1003, 1012-13 (1998) (holding assumption of jurisdiction violates separation of powers). Because the District did not meet the essential criterion of insolvency, satisfaction of the other four criteria, including state authorization to file, is immaterial. See 11 U.S.C. § 109(c) (enumerating among the five criteria for eligibility both insolvency and state authorization); cf. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Moreover, none of the § 109(c) criteria is jurisdictional in nature. See 11 U.S.C. § 109(c) (using terms of eligibility rather than jurisdiction); Promenade Nat'l Bank v. Phillips (In re Phillips), 844 F.2d 230, 235-36 & n.2 (5th Cir. 1988); 2 Lawrence P. King et al., Collier on Bankruptcy ¶ 109.01[2] (1998).

in the ordinary meaning attached to the word, which may be found by aid of commonly accepted dictionary definitions.  See United States v. LaBonte, 117 S. Ct. 1673, 1677 (1997); Addison v. Holly Hill Fruit Prods., 322 U.S. 607, 617-18 (1944); United States v. Jackson, 759 F.2d 342, 344 (4th Cir.), cert. denied, 474 U.S. 924 (1985).

"Due," in the absence of qualification, means "now (presently or immediately) matured and enforceable."  Black's Law Dictionary 499 (6th ed. 1990); see Webster's New International Dictionary 699 (3d ed. 1961) ("having reached the date at which payment is required").  A "matured claim" is defined elsewhere by Black's as one that "is unconditionally due and owing."  Id. at 979. As "due" is unqualified in § 101(32)(C), combining these definitions yields: presently, unconditionally owing and presently enforceable.  The District's interest payments are neither presently, unconditionally owing, nor presently enforceable because they are indefinitely contingent on the availability of certain Plan-defined funds.  Thus, the payments are not and will not become "due" according to these commonly accepted dictionary definitions of the word's ordinary meaning.

Second, the District's interpretation is unsupported by case law.  In cases of involuntary petition, the petitioner must meet a test nearly verbatim to that of § 101(32)(C)(i)--the debtor is "generally not paying such debtor's debts as such

debts become due." 11 U.S.C. § 303(h)(1). The courts' interpretation of "due" in these cases is therefore applicable to § 101(32)(C) by analogy. Courts interpreting this language have held that "evidence which indicates amounts owed by a debtor but which does not indicate when the amounts are actually payable, is insufficient to prove the debtor is not meeting its debts." In re Einhorn, 29 B.R. 966, 969 (Bankr. E.D.N.Y. 1983); see In re Trans-High Corp., 3 B.R. 1, 3 (Bankr. S.D.N.Y. 1980). Accordingly, potential evidence of when debts merely "arose" without evidence of the critical date when they were "actually payable" is not enough. See In re Trans-High Corp., 3 B.R. at 3.

In this case, there was evidence that the District's interest obligations were arising, and would continue to arise, upon each semi-annual installment date. There was, however, no evidence of when the interest payments were or would be actually payable--no evidence of a date certain appointed for payment, and no evidence of when the bondholders expected or expect payment. On the contrary, the Plan's adjustment of the District's debts contemplated the possibility of little or no payment for years, and the possibility that the interest might never be fully paid. Thus, the District failed to marshal the necessary evidence to show that its interest payments were becoming or would become "due" under § 101(32)(C).

Finally, the District's interpretation is unsupported by the purpose of chapter 9 of the Bankruptcy Code. The purpose of chapter 9 is to temporarily

protect a debtor from collection actions so that it may establish a repayment plan with its creditors. See In re Addison Community Hosp. Auth., 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994); H.R. Rep. No. 95-595, at 263 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5963. A debtor, however, needs no automatic stay to protect it from a creditor with no presently mature and enforceable right to payment, and no future prospect of such a right. Congress did not contemplate that a municipal debtor could be eligible for chapter 9 relief based on debts to its bondholders if it is at no risk of default on interest payments (due to agreed modification of the obligations to be contingent on cash flow), and at no risk of default on principal (due to establishment of a government-backed reserve fund).

The District argues that the contingency on the bondholders' right to interest payments does not prevent them from being or becoming "due" because they fall within the Code's broad definition of "claims." See 11 U.S.C. § 101(5). This argument misses the mark. Merely because the bondholders have claims that may be adjusted if the District were insolvent and otherwise eligible for bankruptcy does not necessarily mean the underlying payments have been coming, or will become, "due" for purposes of measuring insolvency. 11 U.S.C. § 101(32)(C).

As evidence that these payments have and will become "due" within the meaning of the word in § 101(32)(C), the District points to the accrual of interest

on its interest obligations commencing from each semi-annual installment date. This mere accrual of interest, however, does not necessarily make the debts "due" within the meaning of the statute. Under the Plan, the legal significance of these installment dates is considerably diminished by the engraftment of the fund-availability contingency. As such, the bondholders are constructively making additional loans to the District originating upon each installment date for any unpaid interest. The mere accrual of interest on any unpaid amounts of these constructive loans does not make the bondholders' rights any less contingent. It is at most evidence of when the debts "arose" without the requisite evidence of a date certain when they are "actually payable." See In re Trans-High Corp., 3 B.R. at 3.

Even if the interest payments would become "due" under the statute, the District put on insufficient evidence to demonstrate that it will be unable to pay them under § 101(32)(C)(ii). Under this test, insolvency is analyzed on a cash-flow basis. See In re City of Bridgeport, 129 B.R. at 337. The Bridgeport court, applying this analysis, found the petitioner was not insolvent because it failed to adequately show its debt payments would cause it a negative cash balance. See id. at 337-38. Similarly, the District's interest obligations in this case, contingent on the District's cash flow, will not cause the District a negative cash balance. Indeed, under a cash-flow analysis of insolvency, obligations that are enforceable

only on a cash-flow basis cannot, by definition, render a debtor insolvent.

Moreover, inability to pay under § 101(32)(C)(ii) "depend[s] upon the inescapable quality of the obligation and the certainty that it cannot be met.  Mere possibility or even speculative probability is not enough."  In re Town of Westlake, 211 B.R. at 865 (quoting In re Hudson & Manhattan R.R., 138 F. Supp. 195, 200 (S.D.N.Y. 1955) (citing First Nat'l Bank of Cincinnati v. Flershem, 290 U.S. 504, 517 (1934))).[3]  "If the maturity of the debt is imminent and the inability to meet it certain, the debtor is unable to meet debts as they mature within the meaning of the statute."  Id.

In this case, the undisputed evidence showed that the maturity, let alone enforceability, of the relevant debts is far from "imminent"; rather, their contingency on the availability of Plan-defined funds leaves them perpetually unmatured to the extent such funds are unavailable.  Furthermore, the debts are far from having an "inescapable quality"; rather, their contingency leaves them perpetually escapable.  The evidence did not even suggest a possibility that the District would lack the cash needed to make its interest payments (which, even if

---

[3]  Decisions such as In re Hudson & Manhattan R.R. construing the language of the Bankruptcy Act of 1898 are useful guides for interpretation of comparable language in the current Code.  See In re Town of Westlake, 211 B.R. at 865.  Chapter 10 of that Act required a petitioner to state that it was "unable to pay its debts as they mature," a phrase essentially the same as that defining insolvency in § 101(32)(C)(ii).  11 U.S.C. § 530(1) (1976).

shown, would not have been enough under <u>Westlake</u>).  Rather, because these obligations are defined by the Plan as due on a cash-flow basis, such a scenario is impossible.

The bankruptcy court's finding that the District failed to carry its burden to show insolvency to be eligible for chapter 9 relief was factually supported by the record, and in addition we are satisfied after a review of the entire record that the finding was no mistake.  Although the District undoubtedly has financial difficulties, its debts were mutually and agreeably adjusted in its confirmed Plan which is not in breach, and, according to its terms, cannot be so on the basis asserted by the District--nonpayment of interest.  Chapter 9 does not offer relief to a municipality simply because it is economically distressed.  <u>See</u> <u>In re City of Bridgeport</u>, 129 B.R. at 339.  Relief is only available if the debtor was "insolvent" at the time of filing within the meaning of this congressionally-approved criterion, which, even construed broadly, the District was not.

AFFIRMED.