

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-20-00051-CV

———————————————————

BUILDER RECOVERY SERVICES LLC, Appellant/Appellee

V.

THE TOWN OF WESTLAKE, TEXAS, Appellee/Appellant

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-304811-18

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

Builder Recovery Services LLC (BRS) brought a declaratory-judgment action challenging the Town of Westlake's (the Town or Westlake) power (1) to pass an ordinance requiring BRS to obtain a license from the Town in order for BRS to conduct its temporary construction waste disposal business and (2) to impose a license fee of 15% on BRS's gross revenue. Both BRS and the Town have filed appeals. In four issues, BRS argues that (1) the Town lacks the statutory authority to require a license or to impose a license fee on commercial solid waste operators who are the subject of the ordinance, (2) any right the Town has to require a license or to impose a fee is preempted by another Texas statute, (3) the license fee is an invalid occupation tax, and (4) the trial court erred in the amount of attorney's fees that it awarded BRS. In its appeal, the Town raises two points challenging (1) the trial court's declaration that the license fee is invalid and (2) the trial court's award of attorney's fees to BRS.

We resolve these issues as follows:

1. The Town has statutory powers that carry with them the right to license commercial solid waste operators, and another statute dealing with the franchise of waste disposal operators does not deprive the Town of the power to license those operators.

2. The Town's act of licensing a commercial solid waste operator does not fall within the ambit of a Texas statute that restricts the use of containers, and that statute does not preempt the Town's ability to require a license or to impose a license fee.

3. The Town repealed the 15% license fee that BRS challenged, and this action moots BRS's challenge to the fee's validity as BRS's challenge is predicated on the amount of the fee.

4. Our disposition of the various issues raised by the parties requires that we reverse and remand the issue of attorney's fees to the trial court.

## II. Factual and Procedural Background

The trial court conducted a bench trial. The witnesses who testified were the managing member of BRS and the town manager of Westlake. The following facts were developed during the trial.

BRS contracts with homebuilders in Westlake to remove the temporary construction waste that the builders generate. The builder places the waste generated by the construction process into a "container" in the form of a dumpster that BRS provides. The dumpster is towed to the site by a rig that has a skid or a trailer behind a large pickup truck. The rig—which is composed of the truck, trailer, and dumpster—weighs approximately 20,000 pounds when fully loaded.

BRS uses the public roads of Westlake to conduct its business though many of the roads within the Town are private because they are located within private

3

developments. BRS makes as many as ten visits to each building site while a home is under construction. When a dumpster is full, BRS places it on the trailer, covers it with a tarp, and removes it from the building site. The waste is hauled from the building site to a disposal facility in another city.

In conducting its business, BRS follows "best practices" by ensuring that the waste is not spilled or blown out of the dumpster while being hauled. According to BRS, the Town has never raised a complaint about how BRS has hauled waste, nor has the Town ever accused BRS of illegal dumping. The Town's witness acknowledged that he was not aware of waste being blown from a BRS dumpster. BRS also maintains insurance and conforms to the requirements of the Texas Commission on Environmental Quality and the Occupational Safety and Health Administration.

BRS offers a different type of service than Westlake's franchised waste hauler, Republic Services. Republic is obligated to pick up all residential trash in the Town, as well as provide free solid waste services and recycling. BRS described its services as being superior to those offered by Republic because its services are tailored to the needs of homebuilders.

BRS is not the only provider of temporary construction waste services in Westlake. The Town also provides temporary construction waste services through Republic. At the time of trial, the Town also licensed other third-party vendors to provide that service.

The process that led to the Town's licensing third-party temporary construction waste disposal vendors apparently began when BRS raised an issue with the Town's staff regarding whether Republic could be the sole hauler of temporary construction waste. Westlake's city council heard the complaints of BRS and other companies that offered temporary construction waste services and the builders that needed those services. The Town's staff began exploring whether companies other than Republic could provide temporary construction waste services. The city council delegated the Town's staff to meet with the builders to discuss amendments to the Town's ordinances in order to address the issue.

BRS claimed that the Town's staff had indicated that if BRS would withdraw its objection to a licensing scheme, the Town would implement a license fee for BRS of 3% of its gross revenue that was generated by hauling temporary construction waste in Westlake. The Town acknowledged that it had offered BRS a 3% fee to encourage it to participate in the licensure program. BRS objected to the Town's offering it special treatment and challenged the Town's authority to base a license fee on a percentage of gross revenue.

The Town eventually passed Ordinance No. 851 that amended Chapter 74 of Westlake's ordinances dealing with solid waste. *See* Westlake, Tex., Code of Ordinances ch. 74, art. III, §§ 74-41–74-50 (2002), https://library.municode.com/tx/westlake/codes/code_of_ordinances?nodeId=CO

OR_CH74SOWA_ARTIIICOSOWALIWAREMAOP.[1]  The ordinance requires that "[c]ommercial solid waste operators collecting, transporting, or disposing of commercial solid waste or temporary construction and demolition waste" obtain a license from the Town.  *Id.* § 74-44(a).  The ordinance created a license-application process, instituted a solid waste license fee of 15% of the operator's gross revenue generated from the collection of waste within Westlake, and required the operator to provide monthly reports of its gross revenue to the Town.  *See id.* §§ 74-45, 74-46(*l*)(4), 74-47(a).

The ordinance not only contained the license fee but also regulated several aspects of how the companies that obtained a commercial solid waste operator license were to conduct their business and to provide information to the Town.  *See generally id.* § 74-46.  The various other features of the ordinance included the following:

- "[I]t shall be the mandatory duty of any person owning or having control over any property where construction requiring a building permit is taking place and where the construction is being performed in relation to a residential structure . . . , prior to the start of construction, to place upon the property a dumpster, provided by the [T]own's franchised or licensed waste collector" and to place various items of waste in it.  *Id.* § 74-5(a).

---

[1]The electronic version of the Town's ordinances states that it was last updated April 3, 2019.

- The dumpster should be placed in a location where it is screened from public view and "removed from the building site immediately upon the completion of construction." *Id.*

- Licensees are to label their vehicles and containers with the license number issued by the Town, to maintain their vehicles and containers, to prevent spills or leaks, to clean up spills or leaks, and to maintain insurance. *See id.* § 74-46(a), (c), (d), (e), (g).

- Licensees are required to maintain their Town licenses, maintain certain records, permit the Town to examine their records, and to submit reports detailing the amount of waste collected, where it was disposed of, and the amount disposed of; the revenue generated; and the names of customers and the services provided to them. *See id.* § 74-46 (i), (j), (k), (*l*).

BRS complained that the ordinance "restrict[ed] the use of [its] containers by requiring a license and . . . a 15 percent gross revenue fee for tax to the Town and [by] submitting reports to the Town in a format [the Town] dictate[s]." BRS argued that the ordinance violated Texas statutes because it restricts the use of BRS's containers and that the ordinance violates other aspects of Texas law. The Town's witness acknowledged that the ordinance did regulate "containers."

BRS's primary complaint about the license fee revolved around the failure to tie the amount of the license fee to the amount of license-associated administrative expenses incurred by the Town. BRS's witness testified that when the fee was initially proposed, he had asked the Town's staff on several occasions about the basis for establishing the amount of the fee and was told there was none.

The Town offered its view that the fee covered

[t]he administrati[on] and oversight of the solid waste services[,] . . . much like the oversight for Republic Services. It would include investigation on any issue regarding damage to City streets, damage to any public or other private properties, any issues with blowing debris, [and] discarded debris as a result of transportation of containers through the Town. It would also include investigation to identify the status of containers, the status of the licenses.

The fee generated by the franchise and license fees did not make the Town whole when compared to the cost to administer and enforce the standards.

But the Town acknowledged that the expenses of its administrative oversight were indeterminate. It had conducted no on-site investigations of BRS's activities. There was no administrative cost other than accepting payments by check. The Town had conducted no "quantificational reports" about the impact of different trucks on road maintenance. The Town had never prepared an estimate of the costs to administer the license either before or after the passage of Ordinance No. 851. The Town had never quantified its cost regarding whether the license fee should be 15% or not. The registration fee for other contractors was $250, and the Town's witness was not aware of how long it took to process other licenses in comparison to a

8

commercial solid waste operator license, but he acknowledged that it took approximately ten minutes to process a commercial solid waste operator license.

When BRS refused to obtain a license, the Town sent notification that BRS had failed to comply with the ordinance and eventually cited BRS for a violation of the ordinance. In response, BRS sued the Town, challenging the ordinance and seeking declarations that the ordinance was invalid and that the license fee constituted an unconstitutional occupation tax and also seeking a temporary injunction to prevent the Town from enforcing the ordinance.[2] BRS also sought to recover its attorney's fees.

The trial court conducted a hearing on the injunction request. The trial court, however, did not issue a temporary injunction because the parties entered into a Rule 11 agreement that permitted BRS to continue to operate in the Town and to escrow the license fees that accrued during the course of the litigation and that provided that "[a]ll Escrow Funds will be disbursed to the prevailing party upon final resolution of the lawsuit, which includes a final determination of any appeals."

At the close of the testimony, the trial court announced that it was making only one finding, which was

> that the 15 percent license fee . . . for the collection of temporary solid
> waste from construction sites is unlawful and invalid under Section
> 361.0961 of the Texas Health and Safety Code, and I'm referring to the

---

[2]BRS carried these requests for relief, other than the request for a temporary injunction, into an amended petition that it filed later in the litigation.

9

15 percent license fee under the Town of Westlake, Texas, Code of Ordinances, Section 74-44, et seq.

In the trial court's view, the Town could do what it needed to do "at a far less onerous fee." The trial court then recessed the matter to see if the parties could work something out.

The trial court later conducted a hearing on BRS's attorney's fees claim. At that hearing, the Town informed the trial court that it had amended its solid waste ordinance. The Town entered the amended ordinance into evidence; the new ordinance reduced the license fee for a commercial solid waste operator "to three percent (3%) of the operator's gross revenue[] from the collection, hauling, or transporting of commercial and industrial solid waste collected within the [T]own." Westlake, Tex., Ordinance 901 (Dec. 2, 2019) (amending § 74-47(a)). The remainder of the original ordinance challenged by BRS was left unchanged other than to clarify the purpose of the ordinance.

BRS offered evidence that it had incurred attorney's fees of $85,233. The trial court determined that it would award BRS only ten percent of its requested fees and summarized its reasoning as follows:

> Hauling trash or materials or garbage or whatever we want to call it is different than electricians driving around or plumbers driving around or so forth, it seems to the [c]ourt. The likelihood that things will be left in the streets and roadways, whether they blow off or so forth, is real, certainly more so than other types of contractors.
>
> The [c]ourt found earlier that the [Town] had the right to regulate these[] but felt that the fee was unreasonable. Given the fact that a

10

percentage of revenue is progressive, it affects the small haulers differently than the large haulers, and I think that . . . is fair and I think the amount of 3 percent is fair.

The [c]ourt recognizes that [BRS] had to bring this action to get this changed. The [c]ourt does not dispute that [$]82,000 -- or $85,233 were [fees] reasonably and necessarily incurred by [BRS].

. . . [T]he [c]ourt commends the [Town] of Westlake for passing that Ordinance 901[.] [T]he [c]ourt's going to award $8,523 as attorney's fees to [BRS], but feels that other than that, the [Town] was the prevailing party.

The trial court subsequently signed a final judgment that contains the following declarations:

Count 1

Regarding the claims in Count 1 of [BRS's] First Amended Petition, the [c]ourt rules as follows:

1. As to [BRS's] request for declaratory judgment that "the Town has no authority under Section 364.034, Tex. Health & Safety Code, or other statute or Texas constitution to require a private operator to obtain a franchise, license, or pay fees to provide temporary solid waste collection services to a construction site within the Town's limits and any such requirement is invalid," the [c]ourt RENDERS judgment in favor of Westlake[] and hereby orders that [BRS] take nothing as to that claim.

2. As to [BRS's] request for declaratory judgment that "Section 74-4, et seq., is invalid under Section 364.034, Tex. Health & Safety Code, to the extent the Town restricts the collection of temporary solid waste from construction sites to the Town's franchisees and licensees," the [c]ourt RENDERS judgment in favor of Westlake[] and hereby orders that [BRS] take nothing as to that claim.

3. As to [BRS's] request for declaratory judgment that "Section 74-4, et seq., is preempted by and invalid under Section 361.0961, Tex.

11

Health & Safety Code[,]" the [c]ourt RENDERS judgment in favor of Westlake[] and hereby orders that [BRS] take nothing as to that claim.

4. As to [BRS's] request for declaratory judgment that "the 15% license fee under Section 74-44, et seq., is unlawful and invalid under Section 361.0961(a)(3), Tex. Health & Safety Code," the [c]ourt RENDERS judgment in favor of [BRS] and hereby declares that a 15% license fee as set forth by Ordinance No. 851 is unreasonable[,] null[,] and void. On this sole count[,] [BRS] is awarded reasonable attorney's fees pursuant to Section 37.[009,] Tex. Civ. Prac. & Rem. Code[,] in the sum of $8,523[,] which the [c]ourt finds reasonable and necessary and just and equitable. [BRS] shall have post-judgment interest on such amount at the maximum allowable rate of interest.

Count 2

Regarding the claim in Count 2 of [BRS's] First Amended Petition, as to [BRS's] request for declaratory judgment that "Section 74-44, et seq., of Ordinance [N]o. 851 establishing the 15% license fee, is an unconstitutional occupation tax and is invalid," the [c]ourt RENDERS judgment in favor of Westlake[] and thereby orders that [BRS] take nothing as to that claim.

Though findings of fact and conclusions of law were requested, the trial court did not enter any findings. BRS subsequently filed a notice of appeal.

## III. Standard of Review

We review declaratory judgments under the same standards as other judgments and decrees. *Waldrop v. Waldrop*, 552 S.W.3d 396, 401 (Tex. App.—Fort Worth 2018, no pet.) (en banc op. on reh'g); *see* Tex. Civ. Prac. & Rem. Code Ann. § 37.010. The procedure that the trial court uses to make its declarations determines the standard of review that we apply on appeal. *Waldrop*, 552 S.W.3d at 401.

Here, the trial court conducted a bench trial. Though requested to do so, the trial court did not enter findings of fact and conclusions of law, and neither party challenges that failure. Thus, we review the trial court's judgment as follows:

> When the trial court does not enter findings of fact and conclusions of law, "all fact findings necessary to support the trial court's judgment and supported by the evidence are implied." *Cadle Co. v. Parks*, 228 S.W.3d 915, 916 (Tex. App.—Dallas 2007, no pet.) (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990)). However, because the record before us includes a reporter's record, these implied findings are not conclusive and may be challenged on sufficiency grounds. *Id.* "The judgment must be affirmed if it can be upheld on any legal theory that finds support in the evidence." *Id.* "It is not necessary for the trial court to articulate the correct legal reason for its judgment." *Id.* (citing *I & JC Corp. v. Helen of Troy L.P.*, 164 S.W.3d 877, 884 (Tex. App.—El Paso 2005, pet. denied)).

*Rourk v. Cameron Appraisal Dist.*, 305 S.W.3d 231, 234–35 (Tex. App.—Corpus Christi–Edinburg 2009, pet. denied). Also, several of the trial court's declarations turn on a question of statutory construction, and thus, we apply a de novo standard of review. *Johnson v. Simmons*, 597 S.W.3d 538, 540 (Tex. App.—Fort Worth 2020, no pet.).

When we are tasked to determine whether a municipal ordinance conforms to a legislative act, we have the two-pronged task of interpreting the legislative act and then determining whether the ordinance conforms to it:

> Our goal in interpreting any statute is to "ascertain and give effect to the Legislature's intent as expressed by the language of the statute." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). To determine that intent, we look first to the "plain and common meaning of the statute's words." *State* [*ex rel. State Dept. of Highways & Pub. Transp.*] *v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We examine statutes as a whole to contextually give meaning to every provision. *Id.* "Municipal ordinances

13

must conform to the limitations imposed by the superior statutes, and only where the ordinance is consistent with them, and each of them, will it be enforced." *Bolton v. Sparks*, 362 S.W.2d 946, 950 (Tex. 1962); *see also Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998) ("[I]n reviewing an ordinance, the court is to consider all the circumstances and [to] determine as a matter of law whether the legislation is invalidated by a relevant statute or constitutional provision.").

*City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 641 (Tex. 2013).

## IV. Analysis

### A. How we generally determine the extent of the statutory authority exercised by the Town

The parties agree that Westlake is a general-law municipality.[3] Westlake's classification as a general-law municipality is pivotal because the classification of a municipality under Texas law implicates how such a municipality must establish its power to act. As a starting point, "[m]unicipalities are creatures of law that are 'created as political subdivisions of the state . . . for the exercise of such powers as are conferred upon them. . . . They represent no sovereignty distinct from the state and possess only such powers and privileges as have been expressly or impliedly conferred upon them.'" *Town of Lakewood Vill. v. Bizios*, 493 S.W.3d 527, 530 (Tex. 2016) (quoting *Payne v. Massey*, 196 S.W.2d 493, 495 (Tex. 1946)). The "nature and source of a municipality's power" are tied to the municipality's classification under Texas law as either a home-rule, a general-law, or a special-law municipality. *Id.* at 531.

---

[3]Various pleadings in our record and other cases describe Westlake as a Type A general-law municipality, and we assume that it is. *See, e.g.*, *In re Town of Westlake*, 211 B.R. 860, 862 (Bankr. N.D. Tex. 1997) (mem. op.); *Huntress v. McGrath*, 946 S.W.2d 480, 481 (Tex. App.—Fort Worth 1997, orig. proceeding).

The distinction between home-rule and general-law municipalities turns on the source of their powers and whether, in the case of home-rule municipalities, they are subject only to limitations placed on those powers by the Legislature, or in the case of a general-law municipalities, they can act only if the legislature has expressly conferred a power on them. *Id.* As the Texas Supreme Court explained,

> Home-rule municipalities "derive their powers from the Texas Constitution" and "possess 'the full power of self government and look to the Legislature not for grants of power, but only for limitations on their power.'" *In re Sanchez*, 81 S.W.3d 794, 796 (Tex. 2002) [(orig. proceeding)] (quoting *Dall. Merchant's & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490–91 (Tex. 1993)). Statutory limitations on home-rule municipal authority are ineffective unless they appear with "unmistakable clarity," and even when they do, a municipality's ordinance is only "unenforceable to the extent it conflicts with [a] state statute." *Id.* Therefore, home-rule municipalities inherently possess the authority to adopt and enforce building codes, absent an express limitation on this authority. Unlike home-rule municipalities, general-law municipalities, such as the Town, "are political subdivisions created by the State and, as such, possess [only] those powers and privileges that the State expressly confers upon them." *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 645 (Tex. 2004).

*Id.*

The more restrictive nature of a general-law municipality's authority tightens the standard we apply in determining whether a power may be implied from power expressly granted to the municipality. As the Texas Supreme Court further explained,

> [G]eneral-law municipalities have "only such implied powers as are reasonably necessary to make effective the powers expressly granted. That is to say, such as are *indispensable* to the declared objects of the [municipalities] and the accomplishment of the purposes of [their] creation." *Tri-City Fresh Water Supply Dist. No. 2 of Harris Cty. v. Mann*, . . . 142 S.W.2d 945, 947 ([Tex.] 1940) (emphasis added); *see also Foster v. City*

15

*of Waco*, . . . 255 S.W. 1104, 1106 ([Tex.] 1923) ("A municipal power will be implied only when without its exercise the expressed duty or authority would be rendered nugatory."). Thus, we strictly construe general-law municipal authority[,] and "[a]ny fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the [municipality], and the power is denied." *Foster*, 255 S.W. at 1106.

*Id.* at 536.

## B. Why we overrule BRS's first issue

### 1. Westlake has the power to license commercial solid waste operators.

As noted above, the trial court declared that BRS take nothing on its request

for a declaration that

> the Town has no authority under Section 364.034, Tex. Health & Safety Code, or other statute or Texas constitution to require a private operator to obtain a franchise, license, or pay fees to provide temporary solid waste collection services to a construction site within the Town's limits[,] and any such requirement is invalid[.]

In its first issue, BRS challenges whether "a general[-]law town has requisite statutory authority to require a residential construction waste hauler to obtain a license and pay a license fee." BRS's challenge takes two forms: first, the Town has no statutory power to license; and second, the power to license in one statute is restricted by a more specific Texas statute, which is Section 364.034 of the Health and Safety Code.

The initial question we address is whether the Town is given the statutory power to license the commercial solid waste operators conducting business in the Town. We hold that it does. The Town is empowered to adopt rules for regulating

16

solid waste collection, and that power carries with it the power to license those conducting waste disposal activities in the Town.

Westlake bases its power to require a license on a statute that gives it broad authority to regulate solid waste. The statute relied on by Westlake is categorical in its wording: "A governing body may adopt rules for regulating solid waste collection, handling, transportation, storage, processing, and disposal." *See* Tex. Health & Safety Code Ann. § 363.111(a).[4] Westlake augments its argument that Section 363.111 gives it broad authority to regulate solid waste by citing to Section 363.113 of the Health and Safety Code that provides that "each municipality shall review the provision of solid waste management services in its jurisdiction and shall assure that those services are provided to all persons in its jurisdiction by a public agency or private person." *See id.* § 363.113.

BRS does not parse the language of the sections of the Health and Safety Code that the Town relies on for its power to license. Instead, BRS argues that the cited provisions do not vest the Town with licensing authority, and under the narrow standard of implied authority derived from *Bizios* that we quoted above, the power to license cannot be implied. We disagree. The Town has been delegated broad powers to police and regulate all aspects of the stream of solid waste; the power to regulate

---

[4]BRS makes no argument that the Town's actions are in violation of the limitation contained in Subsection (b) of Section 363.111 that provides, "The rules may not authorize any activity, method of operation, or procedure prohibited by Chapter 361 (Solid Waste Disposal Act) or by rules or regulations of the commission or other state or federal agencies." *See* Tex. Health & Safety Code Ann. § 363.111(b).

contained in Section 363.111 carries the power to license, and at the least, the power can be implied from the powers expressly given the Town.

As a beginning point, waste disposal is an area that municipalities traditionally have broad powers to regulate; indeed, one of the cases heavily relied on by BRS noted a general-law municipality's ability to regulate waste disposal. *See Grothues v. City of Helotes*, 928 S.W.2d 725, 728 (Tex. App.—San Antonio 1996, no writ) (op. on reh'g). *Grothues* described this power when it determined that a municipality could impose a criminal sanction for the failure to use a city-franchised garbage service though the relevant statute stated that the only "aid to enforcement" of the failure was the suspension of service:

> We do not believe [that] the [L]egislature intended this "aid to enforcement" to be the only means to accomplish this goal. To reach such a conclusion, we would have to ignore other grants of authority the [L]egislature has provided to general-law municipalities to safeguard the health and safety of its citizens. *See* Tex[.] Health & Safety Code Ann. § 122.005 . . . ; *Tex*[.] *Power & Light Co. v. City of Garland*, 431 S.W.2d 511, 517 (Tex. 1968) (city's police powers extend to reasonable protection of public health and safety). The [L]egislature and the courts have long recognized the importance of garbage disposal to the enhancement of health and safety. The enforcement of a comprehensive garbage collection plan such as the City has adopted is clearly within the police power granted to all municipalities. Tex. Loc[.] Gov't Code Ann. § 54.001 . . . ; *cf. City of Breckenridge v. McMullen*, 258 S.W. 1099, 1101 (Tex. [] App.—Fort Worth 1923, no writ) (a home-rule city) (upholding ordinance which assessed $100 per day penalty against one who hauled garbage within the city without a license). Moreover, we recognize that "[p]olice power is not static or unchanging. As the affairs of the people and government change and progress, so the police power changes and progresses to meet the needs." *City of Breckenridge v. Cozart*, 478 S.W.2d 162, 165 (Tex. App.—Eastland 1972, writ ref'd n.r.e.).

18

*Id.* at 729 (footnote omitted).

Embedded in the quote from *Grothues* is a reference to the specific power given by the Local Government Code to all municipalities that they may "enforce each rule, ordinance, or police regulation of the municipality and may punish a violation of a rule, ordinance, or police regulation." *See* Tex. Loc. Gov't Code Ann. § 54.001.[5] *Grothues* also cites a power that Westlake has as a Type A general-law municipality: "(a) The governing body of a Type A general-law municipality may take any action necessary or expedient to promote health or suppress disease, including actions to[] . . . (3) abate any nuisance that is or may become injurious to the public health." *See* Tex. Health & Safety Code Ann. § 122.005(a)(3). Further, as a Type A general-law municipality, Westlake "may adopt an ordinance, act, law, or regulation, not inconsistent with state law, that is necessary for the government, interest, welfare, or good order of the municipality as a body politic." *See* Tex. Loc. Gov't Code Ann. § 51.012.

Thus, Westlake is given the specific power in Section 363.111 to regulate the various aspects of the stream of solid waste and is given broad powers outlined in the preceding paragraph to protect its citizens through the exercise of its police powers. A license is an inherent part of this regulatory power because it is one means for a governmental agency to regulate activities that the Town is empowered to regulate

---

[5]The term "municipality" as used in Section 54.001 encompasses general-law municipalities, home-rule municipalities, and special-law municipalities. *See* Tex. Loc. Gov't Code Ann. § 1.005(3).

19

under Section 363.111 and pursuant to the police powers that protect the health and safety of its citizens; the San Antonio Court of Appeals described the function of a license as follows:

> Historically governments have granted licenses, charters[,] and permits of various types as aids in regulating the activities of its citizens and others who conduct endeavors within the jurisdiction. The right of the government to so regulate is part of its police powers to secure the health, protection, and well[-]being of its citizens. The license, permit, or charter is the authorization of the government to conduct certain businesses or professions or otherwise engage in particular activities. The license or permit is a means of the government to assure that certain criteria are met by the one who wishes to conduct those activities. The criteria vary with the nature of the activity and the goals of the regulating government.

*Ex parte Mata*, 925 S.W.2d 292, 294 (Tex. App.—Corpus Christi–Edinburg 1996, no pet.); *see also Johnson v. City of Austin*, 674 S.W.2d 894, 897 (Tex. App.—Austin 1984, no writ) ("A 'license' has the purpose of regulation under the police power.").

Further, though speaking to the powers of a home-rule municipality, in a case cited by *Grothues*, this court many years ago quoted a number of authorities and explained why the power to regulate the removal of waste carries with it a power to license those conducting that activity:

> The removal of garbage comes under the powers of a municipality, and it is within the police power of a city to pass ordinances and make regulations governing the same. In 2 Beach on Public Corporations, § 995, it is said:
>
> > "A by-law of a city prohibiting any person not duly licensed by its authorities from removing the house dirt and offal from the city is not in restraint of trade, but reasonable and valid, on the ground that, in the interest of public health, a

20

city is justified in providing for some general system for removing offensive substances from the streets by persons engaged by the city, and responsible for the work at such times as they are directed to attend to it."

. . . Dillon on Municipal Corporations, § 369, is as follows:

"Our municipal corporations are usually invested with power to preserve the health and safety of the inhabitants. This is, indeed, one of the purposes of local government, and reasonable by-laws in relation thereto have always been sustained in England as within the incidental authority of corporations to ordain. It will be useful to illustrate the subject by reference to some of the adjudged cases. An ordinance of a city prohibiting, under a penalty, any person not duly licensed therefor by the city authorities from removing or carrying through any of the streets of the city any house dirt, refuse, offal, or filth[] is not improperly in restraint of trade[] and is reasonable and valid. Such a by-law is not in the nature of a monopoly[] but is founded on a wise regard for the public health. It was conceded that the city could regulate the number and kind of horses and carts to be employed by strangers or unlicensed persons, but practically it was considered that the main object of the city could be better accomplished by employing men over whom they have entire control, night and day, who are at hand, and able, from habit, to do the work in the best way and at the proper time."

*McMullen*, 258 S.W. at 1101.

Also, as commentators on municipal authority note, the power to regulate carries the power to license. *See* 9 Eugene McQuillin, *The Law of Municipal Corporations* § 26:34 (3d ed.) ("Municipal power to regulate businesses, occupations and activities embraces or implies the power to license as a mode of regulation and to impose a license fee or tax sufficient in amount to cover the cost of the regulation."); *see also*

*Ex parte Wade*, 146 S.W. 179, 182 (Tex. Crim. App. 1912) ("It is a generally received doctrine that the power granted to a municipality to regulate or to prohibit includes the power to license as a means to those ends.").

And as precedent supporting a conclusion that it has the power to license, Westlake cites us to *Flores v. State*, which Westlake argues recognized that the power to regulate carries the power to license. 33 S.W.3d 907, 915–16 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (op. on reh'g). The appellant in *Flores* appealed her conviction for violating an ordinance requiring entertainers employed at sexually oriented businesses to obtain a permit from the City of Houston. *Id.* at 913. One of appellant's arguments was that the enabling legislation giving the city the power to regulate sexually oriented businesses did not grant the authority to require an entertainer to obtain a license or permit. *Id.* at 916. *Flores* noted that the Legislature had found that allowing the unrestricted operation of sexually oriented businesses was detrimental to public health, safety, and welfare and authorized cities to regulate those businesses. *Id.* The specific statutory authority given permitted a city to determine the location of such businesses and to require an operator of the business to obtain a license. *Id.* The statutes placed no limitation on a city's ability to regulate the business's employees. *Id.* Thus, *Flores* held that "[r]egulation of conduct may include the requirement that an employee acting as an entertainer in a sexually oriented enterprise hold a permit issued by the municipality." *Id.* Though not as explicit as the

22

sources cited in the preceding paragraph, we agree with Westlake that *Flores* supports the proposition that the power to regulate generally carries the power to license.

Here, the Town is given a specifically delegated authority to adopt "rules" regulating the processing of solid waste. *See* Tex. Health & Safety Code Ann. § 363.111(a). One of the tools in the Town's toolbox of regulation is the ability to license.

The authorities that we have cited above also support a conclusion that the power to regulate at the least should be implied because it is reasonably necessary to carry out the power to regulate. BRS challenges this conclusion by arguing that to imply the power to license from the power to regulate violates the limitations on implied powers articulated in *Bizios*, 493 S.W.3d at 535–37. We would disagree with BRS even if we were to conclude that we must imply the power to license from Westlake's express power to regulate. Again, the Texas Supreme Court in *Bizios* held that the only implied powers that existed were those reasonably necessary, i.e., indispensable, to make effective the powers expressly given. *Id.* at 536. *Bizios* involved the question of whether a municipality could impose building codes on structures built in its extraterritorial jurisdiction (ETJ) when its statutory authority granted it only the power to regulate plats and subdivisions in that jurisdiction. *Id.* The Texas Supreme Court held that the power to regulate building codes was not reasonably necessary or indispensable to the discreet power to regulate plats and subdivisions. *Id.* We conclude that *Bizios* is inapposite. Our question is not one of

23

conflict between the exercise of two powers but whether the explicit power to regulate generally implies the power to license. Based on the authority cited above, it does.

Nor do we accept BRS's argument that implying the Town's authority to issue a license is contrary to our holding in *Town of Annetta South v. Seadrift Development, L.P.*, 446 S.W.3d 823, 832 (Tex. App.—Fort Worth 2014, pets. denied). *Annetta South* involved a question of whether an ordinance controlling lot size in a municipality's ETJ violated a Local Government Code provision prohibiting a municipality from regulating the number of residential units that could be built on an acre of land in that jurisdiction. *Id.* at 828–30. We concluded that the ordinance "was intended to be exactly the type of regulation prohibited by [the Local Government Code]—an implicit extension of the Town's zoning-density ordinances into its ETJ under the guise of cleverly drafted rules governing plats and subdivision of land." *Id.* at 830. *Annetta South*'s holding is also inapposite to our holding. As with *Bizios*, that question does not involve the juxtaposition of an ordinance with a statute that shows that the ordinance is prohibited.

As a backup to its statutory argument, BRS turns to an argument that it is a good corporate citizen that follows the best practices in the conduct of its business and that there is thus no need for the ordinance. As a practical matter, BRS's vigilant conduct does not mean that all commercial solid waste operators will be so vigilant.

24

And more specifically to the question at issue, whether it is reasonable to require

licenses from those following best practices is not a matter that we can second-guess.[6]

We cannot second-guess because it is BRS's burden to establish that the

ordinance is invalid, and BRS does not carry that burden by claiming that minds might

differ regarding whether the Town's exercise of its powers is reasonable.   Instead,

BRS must conclusively show that no condition warranted the ordinance's passage.

The Waco Court of Appeals summarized BRS's burden and the prohibition on courts

second-guessing a municipality's reasonable decisions as follows:

> A municipal ordinance is presumed to be valid, and the burden of
> showing its invalidity rests on the party attacking it. *See Safe Water Found.*
> *of Tex. v. City of Houston*, 661 S.W.2d 190, 192 (Tex. App.—Houston [1st
> Dist.] 1983, writ ref'd n.r.e.); *City of Waxahachie v. Watkins*, . . . 275

[6]BRS also argues that Westlake does not have power to license because the specific instances when a general-law municipality has been given the right to license does not include waste processors.  BRS's whole argument is as follows:

> The Legislature has expressly granted general[-]law towns the express
> authority to require licenses for certain occupations in Chapter 251, Tex.
> Loc. Gov't Code.  These occupations include taxicabs (§ 215.004)[;]
> messengers (§ 215.030)[;] peddlers and pawnbrokers (§ 215.031)[;] and
> theatres, circuses[,] and other shows (§ 215.032).   Temporary
> construction waste hauling is not a listed occupation.  Westlake's city
> council is only authorized to grant licenses and require fees for these
> specific occupations. § 215.033, Tex. Loc. Gov't Code.  Chapter 251
> does not authorize Westlake to require BRS to obtain a license in order
> to operate as a private business within [the] Town['s] boundaries.

Based on the discussion set out above, we conclude that the power to license comes with the power to create rules regulating solid waste.  BRS cites us to no authority holding or statute providing that the fact that the Legislature has given a general-law municipality the explicit power to regulate certain businesses abrogates the power to license that comes with the power to regulate.

S.W.2d 477, 480 ([Tex.] 1955) ("Since it is an exercise of the legislative power of the City's Council, the ordinance must be presumed to be valid."); *see also Esp*[*r*]*onceda v. City of San Antonio*, No. 04-02-00561-CV, . . . 2003 WL 21203878[, at *1] (Tex. App.—San Antonio May 22, 2003, pet. denied) (mem. op. [on reh'g]). If reasonable minds may differ as to whether a particular ordinance has a substantial relationship to the public health, safety, morals, or general welfare, no clear abuse of discretion is shown[,] and the ordinance must stand as a valid exercise of the City's police power. *Quick*, 7 S.W.3d at 117. When suit is filed attacking an ordinance passed under a municipality's police powers, "the party attacking the ordinance bears an 'extraordinary burden' to show 'that no conclusive or even controversial or issuable fact or condition existed' [that] would authorize the municipality's passage of the ordinance." *City of Brookside Vill. v. Comeau*, 633 S.W.2d 790, 792–93 (Tex. 1982) (citing *Thompson v. City of Palestine*, 510 S.W.2d 579, 581 (Tex. 1974)).

*Patterson v. City of Bellmead*, No. 10-12-00357-CV, 2013 WL 1188929, at *6 (Tex. App.—Waco Mar. 21, 2013, pet. denied) (mem. op.). The argument—that BRS follows the best practice in the conduct of its business—does not meet the burden of establishing that no condition could exist that warranted the passage of the Town's solid waste ordinance.

BRS also argues that the Town cannot require a license to simply use the Town's streets because, unlike a franchise, BRS has the legal right to use the Town's streets. *See City of Garland v. Tex. Power & Light Co.*, 295 S.W.2d 925, 927–31 (Tex. App.—Dallas 1956, no writ) (discussing franchise of city streets that was given to an electric utility). The most that this argument gains for BRS is that the Town may have had an invalid reason for passing the ordinance. But if the Town is empowered to license commercial solid waste operators, as we hold that it is, that argument gains BRS nothing. It does not carry BRS's "'extraordinary burden' to show 'that no

26

conclusive or even controversial or issuable fact or condition existed' which would authorize the municipality's passage of the ordinance." *See Patterson*, 2013 WL 1188929, at *6.

We have charted why we reject BRS's argument that the Town lacks the ability to license commercial solid waste operators. The power to license is part and parcel of the ability to create rules regulating the solid waste process. BRS's argument—that the power cannot be implied—is unsupported by the authority it cites. Finally, none of BRS's challenges—that are based on its view of whether a license should be required of it—constitute a viable challenge to the Town's decision to require a license.

### 2. Section 364.034 of the Health and Safety Code is not in conflict with the power to regulate that was given to the Town in Section 363.111.

In support of its first issue, BRS next argues that the authority of Section 363.111 conflicts with another statutory provision found in the Health and Safety Code—Section 364.034. *Compare* Tex. Health & Safety Code Ann. § 363.111 *with id.* § 364.034. Because Section 364.034 is the more specific provision, BRS argues that it limits any power found in Section 363.111. BRS's argument creates a false equivalence between the two provisions. Section 363.034 deals with the franchise of private waste disposal services or a town's contract with them; it does not prevent a municipality from licensing operators who provide that service.

We refuse to be taken down the trail that BRS charts for us in its argument that Section 364.034 deprives Westlake of the ability to license commercial solid waste operators. Fundamentally, we reject BRS's argument because it is an attempt to meld the concepts of franchises governed by Section 363.034 with the privilege to regulate an activity by a license that is provided in Section 363.111. The distinction between the two concepts was explained by the Austin Court of Appeals as follows:

> A "franchise" resulting from a contract made through an exercise of the City's legislative or ordinance-making power is fundamentally different from a "privilege" granted by the City under its power to regulate the use of its streets[.] A "franchise" may grant a "privilege," but a "privilege" is not necessarily a "franchise." The word "privilege" is also used, for example, to signify the special right that may be enjoyed only under authority of a license, that is, a right not possessed by persons generally. A "license" has the purpose of regulation under the police power.

*Johnson*, 674 S.W.2d at 897 (citations omitted).

We next outline the structure of Section 364.034 to demonstrate that the statute is not dealing with a license that governs the matters covered by the Town's ordinance in this matter but instead deals with the franchising of waste services, the ability to force citizens to use those services, and the exceptions to this franchising power:

- Section 364.034 begins by providing that a public agency may offer solid waste disposal service, require the use of the service by persons within the territory that it is offered, charge a fee for the service, and "establish

28

the service as a utility separate from other utilities in its territory." Tex. Health & Safety Code Ann. § 364.034(a).

- A person may opt out of using the service under certain circumstances, including if "the person is a private entity that contracts to provide temporary solid waste disposal services to a construction site or project by furnishing a roll-off container used to transport construction waste or demolition debris to a facility for disposal or recycling." *Id.* § 364.034(a–1)(2).

- The fee for the service may be collected by a county, a private or public entity contracted to provide the service, or an entity contracted to collect the fee. *Id.* § 364.034(b).

- If a person does not pay the required fee, the service may be suspended. *Id.* § 364.034(d).

- The statute "does not apply to a person who provides the public or private entity, public agency, or county with written documentation that the person is receiving solid waste disposal services from another entity." *Id.* § 364.034(e). The subsection continues,

  "Except as provided by Subsection (f), the governing body of a municipality may provide that *a franchise it grants or a contract it enters into for solid waste collection and transportation services under this subchapter* or under other law supersedes inside of the municipality's boundaries any other franchise granted or contract entered into under this subchapter."

*Id.* (emphasis added).

- "[A] political subdivision, including a county or a municipality, may not restrict the right of an entity to contract with a *licensed* waste hauler for the collection and removal of domestic septage or of grease trap waste, grit trap waste, lint trap waste, or sand trap waste." *Id.* § 364.034(f) (emphasis added).

- A person is exempt from having the service provided by the agency if "on the date the requirement is adopted, [the person] is receiving under a contract in effect on that date solid waste disposal services at a level that is the same as or higher than the level of services that otherwise would be required." *Id.* § 364.034(g).

- "This section does not apply to a private entity that contracts to provide temporary solid waste disposal services to a construction project." *Id.* § 364.034(h).

By its terms, Section 364.034 deals with a separate matter than the licensing of those who handle waste. *Id.* § 364.034. Further, in Subsection (e), the statute speaks to what it is dealing with as "a franchise it grants or a contract it enters into for solid waste collection and transportation services under this subchapter," not licensing. *Id.* § 364.034(e). Also, the argument—that Section 364.034 must be intended to be the source of the Town's power to license—is belied by the provision in Subsection (f)

30

forestalling a restriction on "the right of an entity to contract with a *licensed* waste hauler for the collection and removal of domestic septage or of grease trap waste, grit trap waste, lint trap waste, or sand trap waste." *See id.* § 364.034(f) (emphasis added). This language demonstrates that a waste hauler may be licensed but that Section 364.034 does not have any provision dealing with the licensing process. *See generally id.* § 364.034. The conclusion to be drawn is that the licensing power must be found elsewhere. The provisions of Section 364.034 do not support BRS's argument that Section 364.034 is intended to prevent a municipality from licensing operators that provide waste services.

In its effort to convince us that Section 364.034 restricts the ability to license, BRS's brief also charts how Section 364.034 has been amended over an almost thirty-year period and places special emphasis on *Grothues* that we have cited previously. 928 S.W.2d at 726–31. But *Grothues* dealt with matters that are not in controversy in this appeal; its holding dealt with the ability of a municipality to franchise waste disposal and to enforce that franchise against those who did not want to use the franchised service. *Id.* at 727–30. *Grothues* plotted the evolution of Section 364.034 and noted that it had originally held in an opinion that was subsequently withdrawn that Helotes "lacked authority to enter into the contract with Garbage Gobbler to exclusively collect and dispose of solid waste within the city limits of Helotes because the *franchise* exceed[ed] the City's statutory authority as a general-law municipality." *Id.* at 727 (emphasis added). *Grothues* then noted that while the matter was pending on

31

rehearing, "the [L]egislature [had] amended the County Solid Waste Control Act to provide a general-law municipality with the authority to contract with a private contractor for the collection and disposal of garbage and other solid waste." *Id.* *Grothues* and the statutory changes that it addressed are not the same matters that are addressed in the Town's ordinance.

BRS also cites us to the House Research Organization bill analysis that speaks to why the Solid Waste Disposal Act required the amendment discussed in *Grothues*. That analysis does not support BRS's contention that the legislative amendment discussed in *Grothues* was intended to address the ability of a municipality to license commercial waste operators to ensure that they conformed to minimum standards of safety and health; instead, it reinforces that the amendment dealt with a municipality's ability to franchise its waste disposal services:

> [SUPPORTERS SAY:] The bill would allow many general[-]law cities to continue what they are already doing: *contracting for waste disposal services.* It would prevent lawsuits such as the recent case involving the City of Helotes from recurring in other cities.
>
> Helotes was sued by a local resident who refused to pay a garbage collection fee because the resident maintained [that] the city did not have the authority to contract with a private company nor the authority to fine a resident for failing to pay the private company the garbage collection fee. [In *Grothues*,] [the] *San Antonio Court of Appeals ruled that general[-]law municipalities, which derive their authority from statute rather than a home-rule charter, are not authorized to contract with other public agencies or with a private contractor for garbage collection without explicit statutory authority.*
>
> In the last 10 years, landfills have decreased from over 900 in 1986 to approximately 225 in 1995. Most cities, counties[,] and regional governments have closed their landfills and are contracting with private

32

solid waste companies. Without this bill, hundreds of contracts by general[-]law cities could be declared void. General[-]law municipalities will have no choice but to dispose of their garbage illegally or [to] spend millions of dollars to open and maintain landfills.

House Research Org., Bill Analysis, Tex. S.B. 1371, 74th Leg., R.S. (1995) (emphases added), https://lrl.texas.gov/scanned/hroBillAnalyses/74-0/SB1371.pdf (last visited Dec. 28, 2020).

Nor do other cases cited by the parties suggest that Section 364.034 limited the power a town has under Section 363.111 to license a commercial solid waste operator for health and safety concerns. BRS cites *Adams v. City of Weslaco*, No. 13-06-00697-CV, 2009 WL 1089442 (Tex. App.—Corpus Christi–Edinburg Apr. 23, 2009, no pet.) (mem. op.). *Adams* dealt with the attempt by a city to grant a franchise for the collection of grease and grit. *Id.* at *1. The case examined then-existing Subsection (e) of Section 364.034 to determine how that subsection impacted the city's franchise power and held that

the tension between the constitutional prohibition against monopolies and the police powers of a city to regulate garbage collection are alleviated by our interpretation of [Sub]section (e). We read the two sentences together to allow an opt-out and still allow *enforcement* of a duly authorized **franchise**, which by the very statutory limitation of its legislative grant, may not disallow an opt-out.

*Id.* at *8 (emphasis added in bold). The quoted holding does not address licensing regulations of the type at issue before us.

The same is true of another case cited by the parties, *Republic Waste Servs. of Tex., Ltd. v. Tex. Disposal Sys., Inc.*, 848 F.3d 342 (5th Cir. 2016). *Republic Waste* dealt

33

with the question of whether Section 364.034 restricted a home-rule city's ability to enter into an exclusive contract for solid waste disposal services. *Id.* at 343. *Republic Waste* concluded that the statute did not restrict a city's home-rule authority to enter into an exclusive contract for solid waste disposal services at a construction project. *Id.* at 347. We cannot see the broad principle that BRS would apparently have us draw from this case—that "[t]he thrust of the discussion in [*Republic Waste*] is that a general[-]law town which lacks inherent authority like San [Angelo] would be prohibited from *regulating* waste haulers like BRS." [Emphasis added.]

*Republic Waste* also, at least tangentially, addresses BRS's argument that Subsection (h) of Section 364.034 excludes the Town from regulating BRS. As set forth above, Subsection (h) provides, "This section does not apply to a private entity that contracts to provide temporary solid waste disposal services to a construction project." Tex. Health & Safety Code Ann. § 364.034(h). *Republic Waste* describes the function of this subsection as limiting the scope of the authority conferred by Subsection (a) of the statute. 848 F.3d at 346. Again, it is an unsupportable inference that being freed from the authority to grant a franchise can be translated into a restriction on any power to license commercial solid waste operators to ensure that they conduct their business safely.

At the end of the day, BRS's argument funnels down to the contention that because Section 364.034 of the Health and Safety Code is a more specific statute that deals with the same ground as the regulatory power for waste disposal given a general-

34

law municipality in Section 363.111, under Section 311.026 of the Government Code, Section 364.034 should trump Section 363.111. But the standard created by the section of the Government Code invoked by BRS belies the conflict. Section 311.026 of the Government Code provides as follows:

> (a) If a general provision conflicts with a special or local provision, the provisions shall be construed, if possible, so that effect is given to both.
>
> (b) If the conflict between the general provision and the special or local provision is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later enactment and the manifest intent is that the general provision prevail.

Tex. Gov't Code Ann. § 311.026. This section counsels us to make an effort to reconcile the allegedly conflicting sections and to allow the special section to prevail only if the conflict is irreconcilable. *See id.* Here, we can achieve reconciliation between the two sections. Section 364.034 deals with the power of a municipality to franchise or to contract with persons to provide waste services. *See* Tex. Health & Safety Code Ann. § 364.034. But that power or lack of power is not irreconcilable with the distinct power in Section 363.111 to regulate those operators by license to ensure that they conduct their business safely and so as not to become a nuisance. *See id.* § 363.111.

Because the Town has the power to license commercial solid waste operators and because Section 364.034 is not in conflict with Section 363.111 that gives the Town the power to regulate, we overrule BRS's first issue.

35

**C. Why we reject BRS's second issue and sustain the Town's first point that Section 361.0961 of the Health and Safety Code does not preempt the Town's ability to license commercial solid waste operators**

In its second issue, BRS turns to another argument aimed at thwarting the Town's powers to regulate solid waste under Section 363.111. *See id.* In this argument, BRS contends that Section 361.0961 of the Health and Safety Code preempts the regulatory authority delegated in Section 363.111 and that the trial court erred when it entered a declaration rendering judgment to the contrary. *See id.* §§ 361.0961, 363.111. We conclude that the trial court's declaration is correct. But this holding also requires that we sustain the Town's first point that challenges the trial court's declaration that the license fee charged by the Town violates Section 361.0961(a)(3) though, as we explain below, we conclude that the challenge to the amount of the fee is moot. We conclude that requiring commercial solid waste operators to be licensed does not fall within the ambit of Section 361.0961 and that the statute does not have the unmistakable clarity needed for us to conclude that it preempts the Town's power to license those operators.

Section 361.0961 of the Health and Safety Code provides as follows:

(a) A local government or other political subdivision may not adopt an ordinance, rule, or regulation to:

> (1) prohibit or restrict, for solid waste management purposes, the sale or use of a container or package in a manner not authorized by state law;

36

(2) prohibit or restrict the processing of solid waste by a solid waste facility, except for a solid waste facility owned by the local government, permitted by the commission for that purpose in a manner not authorized by state law; or

(3) assess a fee or deposit on the sale or use of a container or package.

(b) This section does not prevent a local government or other political subdivision from complying with federal or state law or regulation. A local government or other political subdivision may take any action otherwise prohibited by this section in order to comply with federal requirements or to avoid federal or state penalties or fines.

(c) This section does not limit the authority of a local government to enact zoning ordinances.

*Id.* § 361.0961.

BRS fashions two preemption arguments from Section 361.0961. First, BRS relies on Subsection (a)(1) to argue that the Town's ordinance restricts the sale or use of a container—the dumpsters into which temporary construction waste is placed—in a manner not authorized by state law. Second, BRS argues that the license fee imposed by the Town's ordinance violates Subsection (a)(3) because it assesses a fee or a deposit for the sale or use of a container.

BRS supports its arguments by citing the Texas Supreme Court's recent opinion in *City of Laredo v. Laredo Merchants Ass'n*, which held that Section 361.0961 preempted the City of Laredo's attempt to prohibit businesses from providing single-use plastic or paper checkout bags. 550 S.W.3d 586, 590 (Tex. 2018). We look first to *City of Laredo* for guidance on the preemption principles that we should apply.

37

The question that underlies any preemption determination is not whether the Legislature *can* preempt a local regulation like Ordinance No. 851 but whether it *has*. *Id.* at 593. The overarching principle that guides this determination is whether the intent to impose a limitation on the municipality's powers appears with "unmistakable clarity." *Id.* To decide if the State is acting with this level of clarity, the Texas Supreme Court provided the following signposts to follow:

> The mere "entry of the [S]tate into a field of legislation . . . does not automatically preempt that field from city regulation[."] Rather, "local regulation, ancillary to and in harmony with the general scope and purpose of the state enactment, is acceptable." Absent an express limitation, if the general law and local regulation can coexist peacefully without stepping on each other's toes, both will be given effect or the latter will be invalid only to the extent of any inconsistency.

*Id.* (footnotes omitted). In the Texas Supreme Court's view, Section 361.0961 clearly expressed the Legislature's intent to preempt certain acts of a municipality by its language prohibiting a municipality from adopting an ordinance contrary to the strictures of the section. *Id.* Thus, the question became whether the ordinance at issue fell within the "ambit" of the statute. *Id.* at 593–94. In deciding whether the ordinance fell within the "ambit" of the section's prohibitions, the Texas Supreme Court looked to the usual sources that guide statutory interpretation—the statutory text and the plain meaning of its words. *Id.* at 594.

Here, neither party challenges whether the Town's ordinance falls within certain of Section 361.0961(a)'s ambits by involving solid waste management purposes or the use of a "container." *See* Tex. Health & Safety Code Ann. § 361.0961(a)

(stating that an ordinance may not be adopted that "prohibit[s] or restrict[s], for solid waste management purposes, the sale or use of a container or package in a manner not authorized by state law"). Instead, the parties' first disagreement is whether the ordinance prohibits or restricts the use of a container in a manner not authorized by state law.

*City of Laredo* interpreted Section 361.0961(a)(1)'s language dealing with whether a restriction was in a "manner not authorized by state law" and described Laredo's efforts to find authorization for its ordinance in a host of general state laws. 550 S.W.3d at 597. Those laws were not the express authority that Laredo needed to meet Section 361.0961(a)(1)'s requirement that a prohibition or restriction be in a manner authorized by state law. The opinion interpreted the "manner" language of the statute in the following way:

> But the [Texas Solid Waste Disposal] Act preempts local regulation "in a *manner* not authorized by state law[."] The question is not whether a municipality has the power to regulate. Home-rule cities already have the power of self-governance unless restricted by state law. If "authorized by law" in the preemption provision referred only to the power municipalities already have, the restriction would have no effect. But the preemption provision applies to local regulation when the *manner* is not authorized by state law. Manner is *how* something can be done, not merely *if* it can be. A manner must be stated by, and not merely implied from, a grant of authority. The clear, stated intent of the Act is to control the manner of regulating the sale or use of containers or packages for solid waste management purposes. To conclude otherwise would render the statute meaningless.
>
> By rescinding local control that would otherwise exist, the Act forbids home-rule cities from regulating that subject matter. By authorizing regulation only when municipalities are told how to

permissibly regulate, the Act requires an express authorization. These circumstances are functionally analogous to how general-law municipalities operate under the law. General-law municipalities lack the power of self-government and must look to the Legislature for express grants of power. So too must a home-rule city whose self-governance has been legislatively abrogated.

*Id.* at 598 (footnotes omitted).

Here, by Section 363.111, the Legislature specifically empowered the Town to adopt "rules for regulating" almost every aspect of the handling of solid waste in addition to the other statutes that we have enumerated that give the Town the ability to enforce its police powers. *See* Tex. Health & Safety Code Ann. § 363.111. Licensing is one of the integral means given to a governmental entity to regulate those performing an activity that is subject to regulation. Thus, we conclude that licensing is an express grant of power contained in Section 363.111. *See id.* We acknowledge that the language we quoted from *City of Laredo* says that the manner of regulation cannot be implied, but Section 363.111 provides that a municipality "may adopt rules for regulating" solid waste. *See id.* We do not read the Texas Supreme Court's reference to mean that a power is not express unless every means to regulate an activity is enumerated in the statute and prohibits a municipality from exercising a common means of accomplishing regulation, such as licensing.

Nor do we construe the section's words—"prohibit or restrict, for solid waste management purposes, the sale or use of a container or package"—to be so broad as to embrace the licensing of a commercial solid waste operator. *See id.* BRS is not

40

selling a container. The ordinance does not prohibit BRS from using a container in its business. To the contrary, it does exactly the opposite; it permits BRS to operate a business using a container. *See id.* Thus, the question is whether the ambit of the statute reaches the licensing of a commercial solid waste operator because it restricts the use of a container.

We must construe the word "use" in a way that it is not strained and looks to the context in which it was used. *See Hyde v. Harrison Cty.*, 607 S.W.3d 106, 112 (Tex. App.—Houston [14th Dist.] 2020, pet. filed) ("We must not engage in forced or strained construction; instead, we must yield to the plain sense of the words the Legislature chose."). Also, we must interpret the words of a statute in context.[7]

Subsection (a)(1) of Section 361.0961 does not specify who may use a container. If the word "use" is so broad that it includes a business that provides a

---

[7]As the Texas Supreme Court has previously noted, a word with such a broad definition as "use" should be placed in context:

> Language cannot be interpreted apart from context. The meaning of a word that appears ambiguous when viewed in isolation may become clear when the word is analyzed in light of the terms that surround it. The word "use" poses some interpretational difficulties as well because of the different meanings attributable to it. "Use" and the "use of a license" therefore[] draw their meanings from context, so we look not only to the words themselves but [also] to the statute in its entirety to determine the Legislature's intent. It is a fundamental principle of statutory construction and indeed of language itself that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used.

*TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011) (footnotes omitted).

41

dumpster as part of its services, then every entity involved in the stream of processing solid waste would be embraced by "use" because it is difficult to envision a waste disposal business that would not use a container to hold the waste. The consequence of such an interpretation would be that any time a company could conceive of a situation in which an ordinance might have an impact on the company's use of a trash container, the company could argue that Subsection (a)(1) requires a showing of explicit statutory authority permitting the restriction. As we have noted, the Town has both a traditional police power to regulate waste collection and the statutory authorization permitting the adoption of "rules for regulating solid waste collection, handling, transportation, storage, [and] processing." *See* Tex. Health & Safety Code Ann. § 363.111(a). To stretch the word "use" to the point that it abrogates these powers because the requirement of a license may impose a tangential restriction on the use of a container by a business that provides dumpsters is both strained and unreasonable. Further, nothing in the context supports such a strained interpretation.

Also, though the parties do not challenge that a dumpster is a container, *City of Laredo* suggests that is too broad a reading of the term. *See* 550 S.W.3d at 597. The opinion discusses one of Laredo's arguments in which it apparently claimed that a single-use plastic or paper checkout bag was not a container because it was not a solid waste receptacle. *Id.* The opinion rejected this argument for the following reason:

> The alternative limitation the City proposes—receptacles used to hold or transport solid waste—fares no better. The Act does use "container" in that sense but does not restrict the word to that meaning. The word

"package" does not appear elsewhere in the Act, but "packaging" does, and its use is consistent with the ordinary understanding of the term, not as a solid waste receptacle. The phrase "container or package" suggests analogous meanings, contrary to the City's argument.

*Id.* (footnote omitted). A dumpster is not the type of container that is analogous to a package. We glean from the Texas Supreme Court's discussion that the use of the word "container" does not go so far as to encompass a dumpster, and this reinforces our conclusion that the ambit of Subsection (a)(1) reaches to the licensing of a business that provides dumpsters.

Next, to adopt a meaning of Subsection (a)(1) going so far as to encompass police-power regulation of commercial solid waste operators is out of context with the section of the Health and Safety Code preceding Section 361.0961. Section 361.096(a) provides, "Except as specifically provided by this chapter, this subchapter does not limit the powers and duties of a local government or other political subdivision of the [S]tate as conferred by this or other law." Tex. Health & Safety Code Ann. § 361.096(a). For the reasons that we have outlined, Section 361.0961 does not specifically provide limitations on the powers that we conclude that the Town holds to license commercial solid waste operators.

Finally, even BRS does not argue that the Town lacks the power to license because that act in and of itself restricts the use of a container. Instead, BRS's argument harkens back to reliance on the contention that the ordinance conflicts with Section 364.034:

43

In this case, Westlake as a general[-]law town is authorized to provide or regulate private (as opposed to public) solid waste collection only in § 364.034, Tex. Health & Safety Code; *Grothues*. The Texas Legislature has expressly exempted from [that] section a company like BRS "that contracts to provide temporary solid waste disposal services to a construction project." § 364.034(h), Tex. Health & Safety Code. As a result, Westlake is attempting in Ordinance No. 851 to "restrict, for solid waste management purposes, the sale or use of a container or package in a manner not authorized by state law" in violation of § 361.0961, Tex. Health & Safety Code. The [L]egislature has expressly addressed operations like BRS's by excluding them from statutory coverage, thus ensuring that Westlake's restrictions on BRS's restrictions are "not authorized by state law."

We have already rejected BRS's argument that Section 364.034 is a specific statute that controls and overrides the powers of Section 363.111. Thus, we reject BRS's secondary argument that hinges on the same principle to argue that the ordinance acts in a manner contrary to state law because it violates Section 364.034.

Further, in a preemption analysis, the various ways that Section 361.0961(a)(1) is vague on the question of whether the requirement of a license falls within its ambit also prompts the conclusion that the subsection does not preempt the ability of the Town to license a waste processor with unmistakable clarity. Only by embracing the unreasonably strained definition of "use" that we have already rejected could we reach that conclusion.

We also reject BRS's contention that a prohibition against the adoption of an ordinance that "assess[es] a fee or deposit on the sale or use of a container or package" encompasses the charging of a fee to obtain a license for commercial solid waste operators. In essence, BRS would have us construe this language to mean that

44

because a commercial waste processor uses a container, any license fee is prohibited by Subsection (a)(3). If we assume, as we do, that a municipality can license waste processors, to adopt the construction advocated by BRS would mean that the Legislature intended to prohibit a municipality from being able to charge any fee when it licenses waste processors because the operator's business uses a container. Again, we will not adopt such a strained construction.

The question again devolves to whether a license fee is the assessment of a fee for the "use" of a container. And again, that prompts the question regarding the use of the container by whom. Two businesses "use" the dumpster as part of the service that BRS provides. The first is a homebuilder that contracts with BRS. The Town imposes no fee on that business. The second business is BRS when it hauls away the waste from the construction site. BRS argues that Subsection (a)(3) must apply to it because "BRS would not be in business in Westlake but for the use of its containers" and that the licensing fee found in the Town's ordinance requires "BRS to pay a significant revenue percentage fee in order to use its containers within the Town limits."

The upshot of BRS's argument is that a license fee on any business that uses a container is the assessment of "a fee or deposit on the sale or use of a container or package." *See id.* § 361.0961(a)(3). That view argues for an interpretation of the statute that every tangential governmental administrative cost imposed on a company offering a container as part of its business falls within the ambit of the statute's

45

language and that such a fee is prohibited by the statute. In turn, that would mean that the company benefiting from the ability to operate its business within a municipality would force the taxpayers to bear any administrative cost associated with the license because we must read Subsection (a)(3) to mean that an administrative cost is a fee for the use of a container. Such an interpretation would require so slavish a devotion to the literal definition of "use" to require a strained interpretation. It would also require us to adopt that interpretation when nothing in the context of the statute indicates that "use" should be given so broad a reach, and that interpretation is antithetical to the powers given a municipality to regulate those operating a waste disposal business. And for the reason we stated above, we question whether a dumpster is appropriately considered a container as that term is used in Subsection (a)(3). *See id.*

As discussed above, Subsection (a)(3) does not speak with the specificity for us to conclude that it "limit[s] the powers and duties of a local government or other political subdivision of the state as conferred by this or other law." *Compare id.*, *with id.* § 361.096. And Subsection (a)(3) does not have the unmistakable clarity for us to conclude that it preempts the powers of a town to license commercial solid waste operators.

Thus, we overrule BRS's second issue, and we sustain the Town's first point.

46

**D.** **Why we conclude that BRS's third issue—challenging the validity of the amount of the 15% license fee—is now moot**

We have addressed the questions that result from the Town's ordinances as they exist presently, such as whether the Town may require a license and whether it is deprived of that power by other provisions of Texas law. Now, we turn to whether we should review the remaining question involving the ordinance—the validity of the amount of the 15% license fee that was in controversy during the trial of this matter.[8] The record shows that the Town has replaced the original fee of 15% of gross revenue originally imposed with a fee of 3% of gross revenue. Westlake, Tex., Ordinance 901. As explained below, an issue challenging the validity of an ordinance becomes moot when a municipality substantially alters that ordinance and the exceptions to the mootness doctrine are not applicable. We conclude that on the issue of the amount of the license fee, the Town's ordinance has been substantially altered, and neither the possibility of repetition of the imposition of the license fee in the amount challenged nor the collateral consequences of the imposition of the 15% license fee avoid mootness.

We may not decide an issue that is moot because such a decision is advisory, and the rendition of an advisory decision violates the doctrine of separation of powers. *Trulock v. City of Duncanville*, 277 S.W.3d 920, 923–24 (Tex. App.—Dallas

---

[8]In its third issue, BRS challenges the trial court's determination that the fee was not an unconstitutional occupation tax.

2009, no pet.).  Mootness implicates the standing of a party, and if the controversy becomes moot at any stage of the proceeding, standing may be lost.  *Id.* at 924.[9]

The general principles that we apply in testing an issue's mootness are whether "(1) there are no live controversies between the parties[,] and (2) any decision rendered by the appellate court would be an advisory opinion."  *Id.*  To apply the doctrine of mootness to a legislative enactment, there must be a significant change to the enactment.  *Id.*; *Long Term Care Pharm. All. v. Tex. Health & Human Servs. Comm'n*, 249 S.W.3d 471, 478–79 (Tex. App.—Eastland 2007, no pet.) (discussing and quoting *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 113 S. Ct. 2297 (1993)).

There are two exceptions to the doctrine of mootness:  "(1) the issue is 'capable of repetition, yet evading review[,'] and (2) the collateral consequences doctrine."  *Trulock*, 277 S.W.3d at 924.  The capable-of-repetition-yet-evading-review exception is rarely used and is usually raised as a challenge to unconstitutional acts.  *PNC Bank, N.A. v. RPCG-GP I, LLC*, No. 05-19-00411-CV, 2020 WL 1486846, at *1 (Tex. App.—Dallas Mar. 27, 2020, no pet.) (mem. op.) (citing and quoting *Tex. A & M Univ.–Kingsville v. Yarbrough*, 347 S.W.3d 289, 290 (Tex. 2011)).  That exception is limited to situations where the following circumstances are simultaneously present:

> (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, or the party cannot obtain review

---

[9]Mootness raises a question of subject-matter jurisdiction, which we review de novo.  *See Trulock*, 277 S.W.3d at 923.

48

before the issue becomes moot; and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again.

*Id.* "The mere physical or theoretical possibility that the same party may be subjected to the same action again is not sufficient to satisfy" the exception's requirement that there be a reasonable expectation of repetition. *Trulock*, 277 S.W.3d at 924–25. "The 'collateral consequences' exception has been applied when prejudicial events have occurred "whose effects continued to stigmatize helpless or hated individuals long after the unconstitutional judgment had ceased to operate." *PNC Bank*, 2020 WL 1486846, at *1 (citing *In re Sierra Club*, 420 S.W.3d 153, 158 (Tex. App.—El Paso 2012, orig. proceeding)).

Here, both parties attack the trial court's declarations that involve the original 15% license fee. BRS's attack is that the license fee is a disguised, prohibited occupation tax and that it has the characteristics of such a tax because its primary purpose is to raise revenue and not for the purpose of regulation. BRS also argues that the Town failed to establish a nexus between its cost to administer the license and the amount of the 15% fee. The distinction cited by BRS is the correct test for distinguishing between a license fee and an occupation tax.[10]

---

[10]The cases highlighting the distinction were summarized by the Fifth Circuit in a case applying Texas law:

To determine whether a fee is in reality an occupation tax, Texas courts consider "whether the primary purpose of the exaction, when the statute or ordinance is considered as a whole, is for regulation or for raising

The Town's rejoinder is that the fee must be presumed valid and that whether the fee is valid is a fact question that turns on the issue of reasonableness. A fee may be valid if it covers the cost of regulation or bears some reasonable relationship to the legitimate object of the licensing ordinance.[11] As the Town argues, "BRS did not meet its heavy burden to establish the unreasonableness of the license fee adopted" in the ordinance. Also, the Town contends that the fee should be upheld because of the

revenue." *City of Houston* [*v. Harris Cty. Outdoor Advert. Ass'n*,] 879 S.W.2d [322,] 326 [(Tex. App.—Houston 1994, writ denied)]. "Revenue," as used by Texas courts, "means the amount of money [that] is excessive and more than reasonably necessary to cover the cost of regulation." *Producers Ass'n of San Antonio v. City of San Antonio*, 326 S.W.2d 222, 224 (Tex. [] App.—San Antonio 1959, writ ref'd n.r.e.); *see also Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 461 (Tex. 1997) ("The critical issue is whether the assessment is intended to raise revenue in excess of that reasonably needed for regulation."). Whether a fee is reasonably necessary to cover the cost of regulation is a question of fact. [*Harris Cty. Outdoor Advert. Ass'n*], 879 S.W.2d at 326.

*El Paso Apartment Ass'n v. City of El Paso*, 415 F. App'x 574, 581 (5th Cir. 2011).

[11]As we have previously explained,

The "critical issue" in determining the assessment's primary purpose is "whether the assessment is intended to raise revenue in excess of that reasonably needed for regulation." . . . *Lewellen*, 952 S.W.2d [at] 461[.] "To be reasonable, a license fee cannot be excessive nor more than reasonably necessary to cover the cost of granting the license and of exercising proper police regulation, or it must bear some reasonable relationship to the legitimate object of the licensing ordinance." *Harris Cty. Outdoor Advert. Ass'n*, 879 S.W.2d at 326–27.

*City of Bedford v. Apartment Ass'n of Tarrant Cty., Inc.*, No. 02-16-00356-CV, 2017 WL 3429143, at *4 (Tex. App.—Fort Worth Aug. 10, 2017, pet. denied) (mem. op.).

deference due a legislative body's determination of the need or legitimacy of a particular ordinance.

We outline these arguments to show how much they depend on the issue of whether the amount of the 15% fee was properly calculated to match the needs of the Town. Because that specific fee no longer exists, we cannot advise the parties about the propriety of how to calculate a nonexistent fee. Such an opinion would constitute an advisory opinion, which we are prohibited from rendering. Thus, we conclude that the issues about the 15% fee's validity are moot because we are asked to advise about the propriety of a fee that no longer exists and to test the reasonableness of the now-imposed fee in the vacuum of having no record by which we may determine its propriety.

But BRS argues that we should press ahead in our review because live issues remain for us to review. BRS asserts that

> the new ordinance does not resolve the controversy between the parties. BRS'[s] position is that any license fee imposed on a particular occupant based on a percentage of the business'[s] revenue is an unconstitutional tax. The new ordinance still assesses the revenue percentage fee in order for BRS to use its container.

In essence, BRS's argument is that the Town cannot make any showing that the 3% fee in the new ordinance is reasonable because it is based on a percentage of revenue. To analyze that argument, we would have to prejudge an issue that has not been litigated. At this point, we have no idea how the Town went about determining the propriety of a 3% fee. As BRS itself acknowledges, "No discovery or trial testimony

was obtained regarding the 3% fee amount." Also, we are not prejudging the issue, but we note that a license fee calculated on the basis of gross revenue is not per se invalid. *See* McQuillin, *The Law of Municipal Corporations* § 26:47 ("The amount of license taxes or fees may be based on the amount of business done or sales made, measured by gross sales, gross receipts, or gross income." (footnotes omitted)). One Texas case has permitted a license fee based on a percentage of revenue. *See Reed v. City of Waco*, 223 S.W.2d 247, 254–55 (Tex. App.—Waco 1949, writ ref'd). Further, though BRS contends that a license fee cannot be based on a percentage of revenue, it cites no case to establish that proposition. Thus, the state of the law is not such that we can say with certainty that the Town could never justify a licensing fee based on a percentage of revenues, and we lack a record to test whether the Town's decision to impose such a fee was valid.

BRS also argues that it has escrowed $7,000 in fees pursuant to the Rule 11 agreement that addressed how it would operate during the pendency of the lawsuit with the Town and that the agreement provides that "all escrow funds 'shall be disbursed to the prevailing party upon final resolution of the lawsuit, which includes a final determination of any appeals.'" BRS argues that the escrow of the license fee means that the controversy involving the validity of the 15% fee is still at issue. To support its argument, BRS cites our opinion in *City of Bedford*, 2017 WL 3429143, at *3. As we read *City of Bedford*, the controversy was not mooted after repeal of an ordinance because the City had already collected a number of challenged fees. *City of*

*Bedford* cited *Lowenberg v. City of Dallas* for its holding that "render[ed] judgment for [the] plaintiffs in [a] declaratory-judgment tax-refund suit and explain[ed] that [the] city 'cannot extract millions in unlawful fees and fines, decide the whole thing was a mistake, keep the money, and insist the whole matter is moot' and that '[f]or those who paid, the controversy remains real.'" *Id.* at *6 (citing and quoting *Lowenberg v. City of Dallas*, 261 S.W.3d 54, 57–58 (Tex. 2008)). We conclude that the situation in this case is not parallel to *City of Bedford* or *Lowenberg.* The repeal of Ordinance No. 851's effect on the terms of the Rule 11 agreement is an issue involving that agreement. The mechanism of the Rule 11 agreement puts this case in a different posture than the Town's having collected the fee and then trying to avoid the issue of the fee's validity by amending the ordinance. The question of how the parties litigate who is the prevailing party differs from the mooted question of whether the now-repealed 15% license fee is valid. *See, e.g.*, *Epps v. Fowler*, 351 S.W.3d 862, 864–66 (Tex. 2011) (analyzing use of term "prevailing party" in earnest-money contract).

With respect to the exceptions to the mootness doctrine, we conclude that based on the Town's action of repealing the 15% license fee, there is not a reasonable likelihood that it will impose a fee in that amount in the future. We also conclude that BRS will suffer no lasting stigma as a collateral effect of the repealed fee. Accordingly, we overrule BRS's third issue as moot.

**E. Why we remand the issue of attorney's fees to the trial court**

Both BRS and the Town attack the trial court's award of attorney's fees.[12]  BRS argues that if we reverse any of the trial court's determinations about the validity of the ordinance or whether the license fee is an occupation tax, we should remand the issue of attorney's fees.  The Town argues that the trial court erred by deciding that the 15% license fee was "unreasonable pursuant to Health and Safety Code Section 391.0961" and predicating an award of attorney's fees based on that decision.  We do not reach the propriety of the 15% license fee because we conclude that question is moot.  Thus, we conclude that the trial court should be able to reassess its award of attorney's fees in the light of our ruling, and we remand the issue of attorney's fees to the trial court.  *See Tex. Cent. R.R. & Infrastructure, Inc. v. Miles*, No. 13-19-00297-CV, 2020 WL 2213962, at *3–4 (Tex. App.—Corpus Christi–Edinburg May 7, 2020, pet. filed) (mem. op.) (remanding matter to trial court to redetermine equitable and just fee award under Texas Civil Practice and Remedies Code Section 37.009 in light of appellate court's decision).  Accordingly, without regard to the merits, we sustain BRS's fourth issue and the Town's second point.

## V. Conclusion

We resolve this appeal as follows.  Having overruled BRS's first and second issues, we affirm the portion of the trial court's judgment that includes the following declarations:

---

[12]BRS does so in its fourth issue, and the Town does so in its second point.

54

1. As to [BRS's] request for declaratory judgment that "the Town has no authority under Section 364.034, Tex. Health & Safety Code, or other statute or Texas constitution to require a private operator to obtain a franchise, license, or pay fees to provide temporary solid waste collection services to a construction site within the Town's limits and any such requirement is invalid," the [c]ourt RENDERS judgment in favor of Westlake[] and hereby orders that [BRS] take nothing as to that claim.

2. As to [BRS's] request for declaratory judgment that "Section 74-4, et seq., is invalid under Section 364.034, Tex. Health & Safety Code, to the extent the Town restricts the collection of temporary solid waste from construction sites to the Town's franchisees and licensees," the [c]ourt RENDERS judgment in favor of Westlake[] and hereby orders that [BRS] take nothing as to that claim.

3. As to [BRS's] request for declaratory judgment that "Section 74-4, et seq., is preempted by and invalid under Section 361.0961, Tex. Health & Safety Code[,]" the [c]ourt RENDERS judgment in favor of Westlake[] and hereby orders that [BRS] take nothing as to that claim.

With respect to BRS's third issue, we held that the appeal of the following declaration is moot:

Count 2

Regarding the claim in Count 2 of [BRS's] First Amended Petition, as to [BRS's] request for declaratory judgment that "Section 74-44, et seq., of Ordinance [N]o. 851 establishing the 15% license fee, is an unconstitutional occupation tax and is invalid," the [c]ourt RENDERS judgment in favor of Westlake[] and thereby orders that [BRS] take nothing as to that claim.

Accordingly, we dismiss as moot the portion of BRS's appeal challenging that declaration, vacate the declaration, and dismiss BRS's claims challenging the 15% license fee as an unconstitutional occupation tax.

55

Having sustained the Town's first point, we reverse the portion of the judgment containing the following declaration to the extent that it declares a license fee is unlawful and invalid under Section 361.0961(a)(3) of the Texas Health and Safety Code, and we render judgment that BRS take nothing as to that claim:

> 4. As to [BRS's] request for declaratory judgment that "the 15% license fee under Section 74-44, et seq., is unlawful and invalid under Section 361.0961(a)(3), Tex. Health & Safety Code," the [c]ourt RENDERS judgment in favor of [BRS] and hereby declares that a 15% license fee as set forth by Ordinance No. 851 is unreasonable[,] null[,] and void.

To the extent that this declaration determines the 15% license fee is invalid on a basis other than it constitutes a violation of Section 361.0961(a)(3), we determine that BRS's appeal of that portion of the declaration is moot, vacate the trial court's declaration invaliding the 15% license fee to the extent it does so for reasons other than it is invalid under Section 361.0961(a)(3), and dismiss BRS's claims challenging the 15% license fee as an unconstitutional occupation tax.

Having sustained, without regard to the merits, BRS's fourth issue and the Town's second point that were predicated on the attorney's fees that were awarded based on the preceding declaration, we reverse and remand the issue of attorney's fees to the trial court.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  January 7, 2021

56